CAROL SUSAN SHIPP *v.* AUTOVILLE
LIMITED ET AL.

[No. 253, September Term, 1974.]

*Decided November 22, 1974.*

The cause was argued before ORTH, C. J., and POWERS and DAVIDSON, JJ.

*Charles W. Foster* for appellant.

*Charles C. Bowie,* with whom were *Brault, Scott & Brault* on the brief, for appellees.

ORTH, C. J., delivered the opinion of the Court.

## CASE SUMMARY

This is an appeal from a judgment for costs in favor of the defendants in an *ex delicto* action before a jury in the Circuit Court for Prince George's County in which Carol Susan Shipp, appellant, sued Autoville Limited and John A. B. Fenwick, appellees, seeking damages for malicious prosecution and false arrest and imprisonment. The

judgment was entered upon a directed verdict granted by the court at the close of all the evidence. Maryland Rule 552. We reverse.

## PRELIMINARY ISSUE

A preliminary issue for decision is whether the appeal is properly before us. The case was tried on 21 and 22 January 1974. The court reserved a ruling on a motion for a directed verdict made by appellees at the close of evidence offered by appellant. The course of events thereafter is shown by the docket entries:

> "1/22/74 ... At the conclusion of the entire case, Motion for Directed Verdict renewed. Motion granted.
>
> 1/22/74 Judgment nisi entered in favor of the Defendant for costs.
>
> 1/28/74 Final Judgment entered in favor of the Defendant for costs."

On 20 February 1974 appellant filed an order of appeal. She requested the Clerk to enter an appeal to the Court "... from the judgment entered in this action on January 22, 1974." This was not a final judgment. The general rule is that an appeal may be taken only from a final judgment. Courts Art., § 12-301. See Courts Art., §§ 12-302 and 12-303.

It once was that the practice followed in a law case in entering a final judgment upon a jury trial was different from the practice followed in entering a final judgment upon a bench trial. Uniformity was obtained by rule. Maryland Rule 564 b 1 provides: "Where an action at law is tried upon the facts by the court, the court shall direct judgment *nisi* to be entered upon the law and the evidence." Rule 567 a prescribes: "A motion for a new trial as to all or part of the matters in controversy shall be filed within three days after the reception of a verdict, or, in case of a special verdict or a trial by the court within three days after the entry of a judgment *nisi*." Rule 567 f declares: "If a motion for a new trial is not made, within the time prescribed by section a of this Rule, the clerk shall enter a final judgment as of

course." [1] The Court of Appeals explained it all in *Merlands Club v. Messall*, 238 Md. 359, 362:

> "This portion [§ b 1] of Rule 564 was amended to its present form in 1957, to make the practice of law in regard to the entry of judgment by the court sitting without a jury the same as the practice of entering judgment upon a verdict of a jury. See *Baltimore Luggage Company v. Ligon*, 208 Md. 406, 118 A. 2d 665 (1955). Prior to the amendment of Rule 564, an absolute judgment was entered immediately upon the announcement of the court's 'verdict' when sitting without a jury and upon the rendition of special verdicts by a jury, *Baltimore Luggage Company v. Ligon, supra.* After the amendment, when the facts of the case are tried by the court sitting without a jury, the clerk enters up a judgment *nisi*, which act is analogous to the entry of a verdict when the facts of the case are tried by a jury. The principal purpose of the entry of a judgment *nisi* is to enable an aggrieved party to file a motion for a new trial within three days from the rendition of the verdict or judgment *nisi*."

So with respect to actions at law it is now well settled that a) when no motion for a new trial has been filed, the judgment absolute is entered at the expiration of 3 days from the entry of the judgment *nisi* in a court trial and from the rendition of the verdict in a jury trial, and b) when a motion for a new trial has been filed, the judgment absolute is entered upon denial of the motion, whether the trial be by court or jury. It is the "final judgment" from which an appeal may be taken. An appeal lies only from a judgment absolute and not from a judgment *nisi*. *Hawkins v. GMAC*, 250 Md. 146, 148. Of

---

1. Rule 552 e provides: "Upon the granting by the court of an instruction directing a verdict, the court shall instruct the clerk to enter such a verdict, and to note that it has been entered by the court's instruction. It shall not be necessary for the jury, by its foreman, or otherwise, to render such a verdict." See Rule 563 as to judgment n.o.v. and Rule 560 as to special verdict.

course, the time in which the appeal must be filed runs from the entry of the final judgment. Rule 1012.

The Court of Appeals has stated, iterated and reiterated that jurisdiction may not be conferred upon an appellate court in this jurisdiction by consent of the parties. *Lang v. Catterton,* 267 Md. 268, 275. It has been steadfast in dismissing appeals not taken from a final judgment. It has found its Rule 812, Section a of which is substantially the same as Rule 1012 applicable to this Court, to be mandatory, giving it no alternative but to dismiss the appeal for non-compliance, in the absence of proof of extenuating circumstances.[2] *Hawkins v. GMAC, supra,* at 148. See Rules 835 and 1035. It has dismissed the appeal where the order was filed after the judgment *nisi* but before the judgment absolute, *Merlands Club v. Messall, supra, Hawkins v. GMAC, supra;* after the verdict of the jury but before judgment absolute, even though the clerk should have entered judgment, *Aronstamn v. Coffey,* 259 Md. 47, *Page-Loten v. Howard, et ux.,* 260 Md. 1; in the absence of both a judgment *nisi* and absolute, *A. & A. Masonry v. Polinger,* 259 Md. 199; when there was no final judgment under Rule 605 (Multiple Claims — Judgment Upon) *Arteno v. Arteno,* 257 Md. 227, *Lang v. Catterton, supra.* The rationale of the action of the Court of Appeals in dismissing the appeals was that there was no order of appeal entered within 30 days after the entry of a judgment absolute. It is this rationale which saves the appeal in the case before us. Appellant's order for appeal was filed after the judgment absolute was entered and within 30 days thereof. Although she designated the appeal to be from the judgment *nisi,* the designation was superfluous.[3] The order of appeal would have been effective had it merely directed the clerk to note an appeal; it would necessarily follow that it be from the

---

**2.** "Extenuating circumstances" were present in *Keystone Engineering v. Sutter,* 196 Md. 620 (appellant appealed, but upon realizing that there was no final judgment, applied to judge who granted judgment *nunc pro tunc;* appellee made no motion for dismissal) and in *Kendall v. State,* 132 Md. 93 (where both appellant and appellee considered the appeal valid and so treated it, held, motion to dismiss denied). See 26 Md.L.Rev. 94 (1966).

**3.** The entry of the judgment *nisi* was also superfluous. The verdict directed by the court was the equivalent of a judgment *nisi.*

final judgment.[4] As the order of appeal here was filed within 30 days of the entry of the judgment absolute, we conclude the appeal is properly before us.

## ISSUE

The sole issue on the merits of the appeal is whether the court below erred in directing a verdict for appellees.

Appellant claims that the evidence adduced was sufficient to compel submission of the case to the jury. Appellees argue that it was not, and that they were properly entitled to judgment in their favor as a matter of law.

## FACTS

The bare facts are that appellant issued a check payable to Autoville Limited in the amount of $30.20 drawn on her account at the Suburban Trust Company for repairs Autoville had made to her automobile. She later stopped payment on the check, which was returned to Autoville uncollected for that reason. John A. B. Fenwick, Vice President of Autoville, swore out a warrant for her arrest, charging the crime proscribed by Code, Art. 27, § 144 — obtaining something of value by check with intent to stop payment. She was arrested under authority of the warrant. When the case came on for trial, the prosecutor entered a *nolle prosequi* with the notation "No evidence of criminal intent." Appellant instituted an action against Autoville and Fenwick for damages arising from the malicious prosecution and false arrest and imprisonment of her. The case terminated at the close of all the evidence in the grant of a motion for a directed verdict in favor of the defendants.

We flesh out this apothegm with an account of the circumstances leading to appellant's order to stop payment and appellees' prosecution of her. The prevailing rule of law is that where the court directs in favor of one of the parties, we must assume the truth of all credible evidence in the case

---

4. We note a caveat. We think that if there are two or more appealable judgments in a cause, an appellant designating one would be bound by the designation.

tending to sustain the contention of the party against whom the verdict is directed as well as all inferences of fact reasonably and fairly deducible therefrom. *Trionfo v. R. J. Hellman, Inc.*, 250 Md. 12, 15; *Buchanan v. Galliher*, 11 Md. App. 83, 87-88. We narrate the evidence adduced accordingly.

In 1971 appellant, then single and known as Carol Susan Pike, was a student at the University of Maryland, residing in an apartment at 3588 Powder Mill Rd., Apt. 302, Beltsville, Maryland.[5] On 31 August of that year she and her father, William Patrick Pike, purchased a new 1971 Volkswagen Super Beetle from Silver Spring Auto City, Inc. Among the accessories with which the car was to be delivered equipped as listed on the purchase order was an air conditioner at $379. On 31 May 1972 when the car had been driven about 7,300 miles, appellant took it to Autoville, an authorized service dealer, for repairs to the air conditioning and heater systems. She spoke to William Roberson, a "service adviser". He told her the heater was covered by warranty. His recollection was that "She asked me about the air conditioner and, of course, she said it should be warranty. Now I wasn't too sure because warranty on the air conditioner is kind of tricky, so I said, well, I will check on it. I said, 'I am not sure. I won't guarantee you it is warranty.' I believe she said she would check back with me later during the day. . . . I told her at that time that it was not warranty. Well, she said, 'Go ahead and fix it. It had to be fixed anyhow.' "

When she bought the car she received a Warranty Voucher, issued by Volkswagen of America, Inc. and authenticated by the selling dealer. It specified: "The warranty commences at the date the VW automobile is delivered to the original purchaser, *viz.* on 9-1-71 and covers a period of 24 months or the period before the vehicle has

---

5. Carol Susan Pike and Gary Edward Shipp intermarried on 16 February 1973. In January 1974, at the time of the trial of the case before us, she resided in Gaithersburg and was employed by the Board of Education in Montgomery County. "I work at Montgomery Hills Junior High School and I run a remedial reading center for students in junior high who do not read grade level."

been driven 24,000 miles, whichever event shall first occur. Should any warranty claim arise, you are requested to submit this voucher to your VW dealer." The warranty voucher was contained in a Volkswagen Maintenance Record Book which discussed the warranty terms. It stated: "If any part of the vehicle becomes defective during this period under normal use and service and the vehicle is brought to the workshop of any authorized Volkswagen dealer in the continental United States, Hawaii or Canada, the dealer will, without charge, either repair the defective part or replace it with a new or factory reconditioned part." It designated items not covered by warranty. An air conditioner was not listed as one of them. The warranty was further explained in the book. There was no indication that the air conditioner was not covered. The explanation declared: "Volkswagen of America, Inc. is proud of the quality of the automobiles it imports. It warrants new vehicles for a period of 2 years or 24,000 miles from the date of purchase, whichever comes first. In general the complete vehicle including battery and tires is covered under the provisions of the Volkswagen New Vehicle Warranty. It will be honored by any Authorized Volkswagen Dealer in all 50 States, the District of Columbia and Canada." [6]

Later in the day on 31 May 1972 when she went to Autoville to pick up the repaired car, she questioned the bill,[7] telling the cashier that she understood that at least the heater was under the warranty. The cashier called Roberson over. He simply said that it was not covered — "Well, I made a mistake." She paid the bill by check. She did not press the warranty issue further at the time because ". . . well, he had convinced me — I don't know anything about mechanical process or anything and he talked to me in mechanical language and I figured of the two of us he certainly knew

---

6. Volkswagen owner's manual also mentioned a warranty; It said: "Genuine Volkswagen Parts, new and rebuilt and Approved Volkswagen Accessories are covered by a warranty guaranteeing them to be free of defects in material and workmanship for a period of 6 months or 6,000 miles, whichever comes first."

7. The bill showed a charge of $20 to check out and evacuate the air conditioner system, $5 to "free up heater box", $5 for freon and 20 cents sales tax for a total of $30.20.

more about cars than I did and I at that point had no reason to distrust him." When she went home she talked to her future husband, Gary Shipp, and her father. Both thought the repairs should be under the warranty. Her father said, "We got you a new car so there wouldn't be any problems." He suggested she stop payment on the check. She decided to call Autoville ". . . and talk not just to a service adviser but to a service manager and I asked — I called them and I asked for such a person, I didn't have any name, and I was going to explain how I felt and what I had learned since I got home, and you know, find out if there was something that could be done about it, and if I didn't get any satisfaction from that phone call that I would stop payment on the check, because I didn't think I was going to get any better satisfaction, and they also had my money." She made the phone call the next morning and spoke to a Mr. Hunt who identified himself as a Service Manager. She told him about the transaction, that she felt it was work covered by the warranty and that an error had been made in charging her $30.20. She testified that she told him "That I had on good authority, that other Volkswagen dealerships in the area would have called that work warranty work and would not have charged me and . . . his answer was that I had to bring him notarized affidavits from service managers that this was true, and I said that was ridiculous. Why should the burden of proof be on me, that he should know what the warranty was without everybody else telling him, and he was not really very cooperative. He said, 'Well, I really don't know anything about the case and I will have to look into it and see the invoice and I will call you back.' And because I didn't get any satisfaction and he had not been the most cooperative person I decided it was best if I did stop payment on the check, so I called my father and I told him what had happened and then I called the bank". She stopped payment on her check.

The early part of June 1972 Sharon Greer, appellant's roommate, took a telephone message for appellant from Hunt. According to Ms. Greer, Hunt said, "First of all she does have to pay the check; she should not stop payment on

the check. She has to, you know, pay the check." He went on to explain about the air conditioning. "There was a problem, warranty problem. He said that some parts of the air conditioning, he used all the technical terms, but the gist of it was that some parts of the air conditioner were put in by the manufacturer and other parts were put in by the dealer. The dealer parts that air conditioner was put under wasn't covered by the warranty and he said, 'But if Miss Pike feels that she still is entitled to this money she should go back to the original dealer where she purchased the car and they will in turn reimburse her for the payment, I think it was $30, but they will pay her', but she still had to pay them."

Appellant testified that Fenwick called her about the middle of June. "He informed me that he had a cancelled check and that if I didn't make good on the check he was going to have me arrested and he read out the code and everything that I had violated and after he had gone on for a bit and I hadn't really gotten a chance to say anything I broke in and I said 'Well, I did have a reason for stopping payment on that check.' And I explained to him what it was, and that I felt it needed more of an explanation as to why this was not warranty work and then he told me that he really did not know any details about the case and these are his own words, he said the only thing he knew was he had my cancelled check in his hand. I use his words because I remember them. And he said that he would have to look into it and that he would get back to me in the mail and either he would send me the check or he would send me information as to that he would proceed with prosecuting me for stopping payment."

Fenwick told about his telephone call to appellant. "It took a while to contact her, but I finally did through her mother. Her mother gave me a phone number where I could reach her and I got her at a number other than the one on this check,[8] I think. . . . She said, well, she told me something

----

8. The check was imprinted with appellant's name and address, "Carol Susan Pike, 620 University Blvd., West, Silver Spring, Md. 20901." This was also the name and address on the repair bill. The address, that of her parents, was apparently her permanent address as distinguished from the apartment in which she lived as a college student.

about a warranty dispute that she didn't believe that she should be responsible for paying for some repairs. All I had at that time was the check and I believe that I said that 'Well, I will have to look into it' or something like that . . . . Well, I believe that I told her that I would be back to her, one way or another and I think that because I had a hard time getting her on the telephone that I said that I would send her something in the mail." He "probably" asked her that the check be made good. Fenwick decided that the work that was performed was not covered by the Volkswagen warranty as he interpreted it. He sent a letter, signed by him as Vice President, to the address that was on the check and the invoice. The letter was dated 9 June 1972. It read:

> "The Suburban Trust Company has returned your check #312 written to Autoville, Ltd. for $30.20 marked 'Payment Stopped'. Unless we have received this sum in cash within ten days of receipt of this letter, we shall use the avenues of legal recourse left open to us.
>
> If you have any questions on this matter, please contact us."

The letter was mailed on 9 June 1972 by certified mail, return receipt requested, with instruction to deliver to addressee only. It was returned "Unclaimed". Fenwick had no contact with appellant between the time he talked to her on the telephone and the sending of the letter. When the letter was returned he went to Detective Schachner and complained. Schachner said, "We are not a collection agency." Fenwick replied, "Well, I don't particularly care about [the money] at this point." No civil suit had been instituted. During his testimony he was asked why he went to the police. He explained: "Well, because I just, I couldn't understand why someone could just arbitrarily decide to — well, I considered it stealing. They had gotten something and not given anything back for it, and I just — I didn't feel it was right." He could not remember whether he was told that appellant had discussed the warranty problem with

Roberson and Hunt. He admitted that in the telephone conversation with appellant he told her when she inquired about the warranty that he would be in touch with her concerning the warranty matter. But he made clear he did not do so. "The only time I believed I talked to her was the one time on the telephone. I had never seen her. Never met her. Never seen her car at all." There was no mention of the warranty dispute in his letter of 9 June.

In Fenwick's application for a warrant for appellant's arrest the reason as set out therein was that appellant "paid for services received with a worthless check, number 312, dated 5-31-72, in the amount of $30.20 drawn on the Suburban Trust Co., Hyattsville, Md., returned Payment Stopped. Said check was given to an employee, Florence V. Webb, who can identify the accused. No restitution has been made to date. The accused did not claim the registered letter sent to notify her of the banks refusal to honor said check." The warrant was issued upon the sworn application of "John A. B. Fenwick agent for Autoville Ltd." The defendant was named as Carol S. Pike, 620 University Blvd., West, Silver Spring, Maryland, who was described as "W/F/20/5'3/140 lbs/heavy bld/bleached blond".[9] It charged her with violation of Code, Art. 27, § 144 and gave a "Concise statement of essential facts constituting offense charged":

> "did unlawfully with intent to cheat and defraud the said Florence V. Webb, agent for Autoville, Ltd., 9330 Baltimore Blvd., College Park, Maryland, of Thirty dollars and twenty cents ($30.20), current money of the United States by means of a check drawn on Suburban Trust Company, Hyattsville, Maryland, which said bank was not indebted to the drawer, and said drawer did not provide for payment of same, said check was not paid on presentation and returned marked payment

---

**9.** The mug shots taken of appellant showed vividly the substantial inaccuracy of this description. Appellant appeared to have dark hair, and her build was not "heavy". She testified she had never had bleached blond hair and that she was 5 feet 9 inches tall.

stopped and said check was not made good within ten (10) days."

During his testimony, Fenwick expressly conceded that other than the fact that he had a check on which payment had been stopped, he had no other evidence that appellant intended to stop payment on the check when she delivered it to Autoville. Appellant asserted emphatically in testifying that when she gave the check to Autoville she had no intention of stopping payment on it. It is clear that when she made the check there were sufficient funds in her account to cover it. She had deposited $75.34 in her checking account before she wrote the check. The deposit slip so showing and a ledger sheet of her account were received in evidence. The ledger sheet showed that when the check was charged to her account on 5 June (it was credited the same day as not paid) there was a balance on deposit of $263.12. The balance on 31 May was $82.44. At no time between the time the check was made and the time it was presented for payment were there insufficient funds to cover it. Around the 4th of July 1972 appellant went to Ocean City with her parents. When she returned home on 7 July there was a message to call Detective Schachner. He told her a warrant had been issued for her arrest and that it would be better for her to come in on her own than for him to send a squad car after her. She went to the Forestville Police Station with her mother and was arrested. She was transported to the Hyattsville Police Station. She was given a copy of the warrant, informed of her rights, fingerprinted and photographed.[10] After being in

---

10. She described her reaction:

"Well, I was extremely upset at first because I was just scared and terrified and couldn't believe that this had happened over $30.20 when no one had ever talked to me, and afterward I think the best word would be I was humiliated. Nobody knew when I was in that police station being booked and fingerprinted why I was there. Detective Schachner on more than one occasion referred to me as 'the white female 1015' or some number and at the time I was being fingerprinted and photographed it was not a private room. Policemen and other people were walking in and out and saw me standing there having my picture taken and at no time did anyone say why I was there and, you know, I didn't — nobody knew why. I was just a criminal like anybody else being processed in there and I think it was probably one of the most upsetting things that has ever happened to me."

custody over two hours she was released on her own recognizance.

## DECISION

*The Torts of False Arrest and False Imprisonment*

The Court of Appeals in *Great Atl. & Pac. Tea Co. v. Paul*, 256 Md. 643, 654-657, neatly summed up the status of the law in this jurisdiction with respect to false arrest and false imprisonment: [11]

> "False imprisonment and false arrest are common law torts that apparently differ only in terminology. 32 Am.Jur.2d, *False Imprisonment*, Sec. 1 (1967). The necessary elements of a case for false imprisonment are a deprivation of the liberty of another without his consent and without legal justification. *Safeway Stores Inc. v. Barrack*, 210 Md. 168, 122 A. 2d 457 (1956).
>
> The term legal justification has created some confusion in other courts. *See Roberts v. Hecht Company*, 280 F. Supp. 639 (D. Md. 1968). This confusion arises because of the frequent statement that probable cause is not a defense to an action for false imprisonment but legal justification is. Probable cause, however, may be shown in mitigation of punitive damages. *Clark's Park v. Hranicka*, 246 Md. 178, 227, A. 2d 726 (1967); *Fleisher v. Ensminger*, 140 Md. 604, 118 A. 153 (1922).

\* \* \*

We think the law in Maryland is settled on this point.[12] When the cases speak of legal justification

---

11. Appellant sought damages in the first and second counts of her Declaration from Autoville — in the first count for false arrest and false imprisonment and in the second count for malicious prosecution. She sought damages in the third and fourth counts from Fenwick — in the third count for false arrest and false imprisonment and in the fourth count for malicious prosecution.

12. The Court expressly rejected Restatement of Torts (Second), Sec. 120A, providing that the detention of a suspected shoplifter may be justified by probable cause.

we read this as equivalent to legal authority. In *Dorsey v. Winters*, 143 Md. 399, 122A. 257 (1923) the jury was instructed that if they found 'that defendant deprived the plaintiff of his liberty without probable cause, then the verdict must be for the plaintiff.' We held this instruction defective for failure to distinguish between the torts of false imprisonment and malicious prosecution, saying at page 411, 'If the prayer was based upon the theory that the detention of the plaintiff was unlawful, it is defective in failing to require the jury to find as a fact essential to recovery that the arrest and imprisonment were without color of legal authority.'

Whatever technical distinction there may be between an 'arrest' and a 'detention' the test whether legal justification existed in a particular case has been judged by the principles applicable to the law of arrest. . . .

* * *

As it now stands in this state arrest or detention without legal authority, with or without probable cause, will render the arresting person liable for such damages 'as the jury may consider actual compensation for the unlawful invasion of his [the plaintiff's] rights and the injury to his person and feelings.' In addition, if the act was 'inflicted maliciously or wantonly, the jury are not restricted to an award of compensatory damages, but [in its discretion] may award . . . such punitive damages as the circumstances of the case may warrant as a punishment for the wrong done and as an example to others.' *Dennis v. Baltimore Transit Co.*, 189 Md. 610, 616, 56 A. 2d 813 (1948). If punitive damages are allowable, probable cause for the detention may be shown in mitigation of this stripe of damage as

having a bearing on the quality of any malice or wantonness found to exist. *Clark's Park v. Hranicka, supra* at 187; *Safeway Stores Inc. v. Barrack, supra* at 173-174; *Fleisher v. Ensminger, supra* at 620; *Lewin v. Uzuber,* 65 Md. 341, 348-49, 4 A. 285 (1886)." [13] (footnote omitted)

This was in full accord with *Safeway Stores Inc. v. Barrack, supra,* cited therein, in which it was stated at 173-174, that for false imprisonment ". . . there must be a deprivation of the liberty of another without his consent and without legal justification. Although intent is necessary, 'malice' is not, nor is probable cause a defense." It is fundamental, therefore, that when an arrest has been effected by valid legal process, an action for false arrest and false imprisonment arising from the legal arrest, will not lie. *Brewer v. Mele,* 267 Md. 437, 440; *Lewin v. Uzuber,* 65 Md. 341.

## The Tort of Malicious Prosecution

The necessary elements of a case for malicious prosecution of a criminal charge are well established. A summary of the requisites for such an action was set out in *Banks v. Montgomery Ward & Co.,* 212 Md. 31, 38 and applied in *Gladding Chevrolet v. Fowler,* 264 Md. 499, 505:

"To prevail in a suit for malicious prosecution the plaintiff must show: (1) that the criminal proceeding instituted or abetted by the defendant has terminated in his favor, apart from whether any inference as to probable cause for the proceeding arises from the termination; (2) a want of probable cause for the proceeding which may, or may not, be inferred from the termination of the proceeding, depending upon the manner of the

---

**13.** *But see Montgomery Ward & Co. v. Cliser,* 267 Md. 406, 415-416, where the Court seems to speak in terms of probable cause for the arrest with respect to a directed verdict. There was, however, an award of punitive damages.

termination; (3) malice, which is a primary purpose for the institution of the proceeding, other than that of bringing an offender to justice. *Safeway Stores, Inc. v. Barrack,* 210 Md. 168, 173, *supra,* and authorities cited."

See *Durante v. Braun,* 263 Md. 685, 688; *Jannenga v. Libernini,* 222 Md. 469, 472. False arrest, false imprisonment, and malicious prosecution are kindred actions. The Court pointed out in *Safeway Stores, Inc. v. Barrack, supra,* at 174, "The chief distinction between the two actions [false imprisonment and malicious prosecution] lies in the existence of valid legal authority for the restraint imposed." Prosser, *Torts,* 4th ed. (1971) § 12, p. 49, puts it thus:

"The distinction between the two lies in the existence of valid legal authority for the restraint imposed. If the defendant complies with the formal requirements of the law, as by swearing out a valid warrant, so that the arrest of the plaintiff is legally authorized, the court and its officers are not his agents to make the arrest, and their acts are those of the law and the state, and not to be imputed to him. He is therefore liable, if at all, only for a misuse of legal process to effect a valid arrest for an improper purpose. The action must be for malicious prosecution, upon proof of malice and want of probable cause, as well as termination of the proceeding in favor of the plaintiff." (footnotes omitted)

*The Instant Case — False Arrest and False Imprisonment*

Appellant presents no argument in her brief going to the propriety of the direction of the verdict in regard to false arrest and false imprisonment. We deem, therefore, that she has abandoned any contention regarding them. Maryland Rule 1046 f. In any event, it is clear that appellant's arrest and the restraint imposed were under valid legal authority — a duly issued arrest warrant sworn out by Fenwick as

Vice President of Autoville. Autoville and Fenwick complied with the formal requirements of the law in swearing out the warrant and while it may be that they could be liable for misuse of legal process to effect a legal arrest for an improper purpose, the actions of false arrest and false imprisonment will not lie against them. We conclude that the trial court did not err in directing a verdict in favor of appellees with respect to false arrest and false imprisonment, that is as to counts one and three of the Declaration.

*The Instant Case — Malicious Prosecution*

The crime of which appellant was accused is proscribed by Code, Art. 27, § 144, as amended effective 1 July 1972 with no change in the substantive offense:

> "Every person who shall obtain money, credit, goods, wares or anything of value, of the value of one hundred dollars or more, from another by means of a check, draft or any other negotiable instrument of any kind, with intent at the time of giving such instrument without the consent of such other to stop or countermand the payment of the same or otherwise to cause the drawee thereof to disregard or dishonor or refuse to recognize such instrument, shall be deemed to have obtained such money, credit, goods, wares, or other thing of value with intent to cheat and defraud another and upon conviction, shall be fined or imprisoned or both, as provided in § 140 of this article, at the discretion of the court. Where the value of such money, credit, goods, wares or anything of value is less than one hundred dollars, such person, upon conviction, shall be deemed guilty of a misdemeanor and fined not more than fifty dollars or imprisoned for not more than eighteen months in the house of correction or jail, or both fined and imprisoned in the discretion of the court. And upon the trial of any person accused of violation of this section, the fact that such person without the consent of such other to

stop or countermand the countermanded payment of such instrument, or otherwise caused the drawee to disregard or dishonor the same without returning or tendering the return of the thing so obtained shall be presumptive evidence of such intent to cheat and defraud."

The criminal proceeding under this statute which was instituted or abetted by appellees terminated in appellant's favor. The question is whether the court properly refused to permit the elements of (a) want of probable cause for the criminal proceeding, and (b) malice as the primary purpose for the institution of the proceeding, to be submitted to the jury.

## (a)

*Gladding Chevrolet v. Fowler, supra,* at 505-506, reaffirms the definition of probable cause set out in *Banks v. Montgomery Ward & Co., supra,* at 39:

"Probable cause is a reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing that the accused is guilty.... Mere belief, however sincere, is not sufficient. There must be such grounds of belief founded upon actual knowledge of facts as would influence the mind of a reasonable person." (citations omitted)

It is well settled that the existence of probable cause is a question to be determined as a matter of law by the court upon a given set of facts, but when the facts are disputed, the question shall be submitted to the jury under adequate instructions. *Montgomery Ward & Co. v. Cliser, supra,* at 416, and cases cited. *Kennedy v. Crouch,* 191 Md. 580, 590-591, said it a little differently but to like effect:

"What facts are sufficient to show want of probable cause in any case is, of course, a question of law for the court; but whether such facts are proved by the evidence is a question for the jury.

> \* \* \* If the facts relied on to constitute probable cause, or the inferences to be drawn therefrom, are clear and undisputed, the question is one of law for the court; but if the evidence or inferences to be drawn therefrom are disputed, it becomes a mixed question of law and fact." (citations omitted)

The trial judge explained to the jury why he directed a verdict in favor of appellees. Referring to the intent required by § 144, he recognized that "it is always difficult to prove what goes on in the mind of a person charged with such an offense." But the intent here gave him no difficulty, even though he was satisfied that appellant had no intention to defraud when she gave the check. "Mrs. Shipp deposited money in the Suburban Trust Company to cover payment of this, came back, got her car, paid for it, no intention to defraud. I go along with that." He made clear that the reason "intent" gave him no difficulty was because of the presumption declared in the statute of an intent to cheat and defraud when the person giving the check causes the drawee to dishonor it without returning or tendering the return of the thing obtained. He said, "Now we won't in my discussion belabor this particular section too much. It is obvious that when you receive services you cannot return the services. They are spent. But, it is also obvious from the statute that if you don't get the consent to stop payment there is a presumption under the law of such intent to cheat and defraud." He felt the advice given appellant to stop payment on the check "was not the best that could have been given, that because of the fact there is a presumption under the law where the stop payment was not consented to that that in and of itself would be enough to defeat the Plaintiff's action because of want of probable cause." We are constrained to conclude that the trial judge considered the statutory presumption to be a conclusive rather than a rebuttable presumption. We do not find this to have been the legislative intent. The statute speaks in terms of "presumptive evidence" upon the trial and we think that "presumptive evidence" of intent to defraud may be rebutted by evidence tending to show that there was no such intent. The

presumption was simply legislative recognition of the inherent difficulty in proving intent to cheat and defraud, and may establish such intent *prima facie* at trial. But it was surely not meant by the Legislature to be legally sufficient to establish conclusively such intent beyond a reasonable doubt.

Even if the remarks of the trial judge may be fairly interpreted as considering the presumption rebuttable, when we take the whole of his comments as finding that the evidence adduced was not sufficient to raise a dispute as to want of probable cause, we think he was wrong. In the first place, we note that a want of probable cause may be inferred from the termination of the proceeding, depending upon the manner of the termination. It is generally held that a *nolle pros* is a sufficient termination of the proceeding. *Norvell v. Safeway Stores, Inc.,* 212 Md. 14, 22. See *Greathouse v. State,* 5 Md. App. 675. *Norvell* observes that whether such a determination is evidence of a want of probable cause is a question on which the authorities are divided. *"Prosser* inclines to the view that it is not. See also *Western Union Telegraph Co. v. Thomasson,* [251 F. 833], p. 838, and *Shoemaker v. Shoemaker,* 78 A. 2d 605, 608 (N.J. App. Div.). The *Restatement, Torts,* § 665, takes the position that a dismissal by a public prosecutor is not evidence of a want of probable cause, but *contra,* as to dismissal by a private prosecutor. In the latter situation it has been held here that the dismissal by an instigator is not in itself sufficient evidence. *Flickinger v. Wagner,* 46 Md. 580, 603." *Id.,* at 22-23. The question has not been settled in this jurisdiction. But here we have on the record not merely the fact of the entry of a *nolle prosequi,* which may be entered by the State's Attorney only in open court, Rule 711, but also the reason for the entry. The prosecutor ascribed the *nolle pros* to "No evidence of criminal intent." It may well be that the termination here may be properly considered, at least to the extent of tending to show that the facts or inferences drawable from the "probable cause" that motivated the criminal charge were not clear and undisputed. See *Carl M. Freeman Assoc. v. Murray,* 18 Md. App. 419. But we need

not decide the point. Even apart from any inference as to want of probable cause for the criminal proceeding arising from the termination, we are of the opinion that the trial court erred in ruling as a matter of law that appellant did not produce legally sufficient evidence to warrant submission to the jury of the issue of lack of probable cause on the part of appellees. As we have indicated, in rendering a directed verdict against appellant, the court was bound to assume the truth of all credible evidence supporting appellant's contention and the reasonable inferences to be drawn from them. Viewed in this light, the evidence was patently not clear and undisputed that appellant obtained the repairs to her car by means of a check with intent at the time of giving it to stop the payment of it. She deposited money in her checking account sufficient to cover the amount of the check before she drew it. She stopped payment of it in the light of the warranty provisions, the meaning of which was uncertain to Autoville's agents. Three of them had promised to look into the question. Fenwick, before he swore out the warrant, knew directly from appellant that she was seriously questioning the propriety of the charge for repairs and he could have ascertained by reasonable inquiry of other employees that she had raised the issue with them. He swore out the warrant without contacting her about the warranty even though he told her he would look into the warranty question. The return of the letter unclaimed apparently triggered his visit to the police. The letter was sent to the address on the check, the residence of her parents, but it was mailed with direction to deliver to addressee only. Fenwick, however, was on notice when he sent the letter that she may not be at that address. He testified that he had trouble contacting her and reached her through her mother who lived at the address he had. Her mother gave him a number "other than the one on this check", and he reached appellant there. He could have asked her for her current address or inquired further of her mother when the letter was returned. Appellant testified that when she gave the check she had no intention of stopping the payment of it. Fenwick expressly stated he had

no evidence of any unlawful intent other than that payment had been stopped. Fenwick had appellant's explanation why payment had been stopped before he instituted the criminal prosecution. He could not with impunity ignore it. A failure to investigate may destroy probable cause. *Montgomery Ward & Company, Inc. v. Keulemans*, 23 Md. App. 81. See *Durante v. Braun, supra.* We find that the question of probable cause to initiate the prosecution was for the jury.[14]

### (b)

The rule of law with respect to malice was succinctly put by the Court of Appeals in *Banks v. Montgomery Ward & Co., supra,* at 42:

> "Where there is lack of probable cause, malice may be inferred, although the inference may be rebutted by the defendant. The question of malice, that is, the question of whether the defendant acted from other than proper motives, unlike probable cause, is a question for the jury. *Torsch v. Dell,* 88 Md. 459."

In *Safeway Stores, Inc. v. Barrack, supra,* the Court said, at 175·

> "We have held that malice may be inferred from a lack of probable cause, although want of probable cause cannot be inferred from any degree of malice. . . . Probable cause is a good defense, although the instigator may have been actuated by malice and the accused was acquitted. . . . The presumption of malice resulting from the want of probable cause is only *prima facie* and may be rebutted by the circumstances under which the defendant acted." (citations omitted)

---

**14.** Although Fenwick discussed the matter with his attorney the trial judge correctly determined that "His advice in this particular case, the attorney's advice cannot be used as a method of defeating the action of the Plaintiff because there is no testimony as to the specifics which is necessary for a person to be relieved of the responsibility of the act fully upon the advice of the attorney." Fenwick never testified that his lawyer advised him to prosecute and the lawyer had no independent recollection of the conversation. See *Gladding Chevrolet v. Fowler, supra,* at 506-510.

578 

We find that the question of malice was for the jury.

We conclude that the trial court erred in directing a verdict in favor of appellees with respect to malicious prosecution, that is counts two and four of the Declaration. To hold otherwise, in our opinion, would deprive appellant of the benefit of the assumptions and inferences to which she was lawfully entitled as the party against whom the motion for a directed verdict was made.

The judgment is reversed. Appellant is entitled to a new trial under counts two and four of her Declaration, seeking damages for malicious prosecution.

*Judgment reversed; case remanded for a new trial in accordance with this opinion; costs to be paid by appellees.*