# CONTINENTAL CASUALTY CO. ET AL. V. RUSSELL R. MIRABILE

[No. 1523, September Term, 1981.]

*Decided September 7, 1982.*

The cause was argued before MORTON and MOYLAN, JJ., and CLAYTON C. CARTER, Associate Judge of the Second Judicial Circuit, specially assigned.

*Thomas S. Martin,* with whom were *John Henry Lewin, Jr., Kathleen M. Gallogly* and *Venable, Baetjer & Howard* on the brief, for appellants.

*C. Christopher Brown,* with whom was *Abraham Paul Korotki* on the brief, for appellee.

MORTON, J., delivered the opinion of the Court.

This appeal arises from what is, at the least, a series of petty humiliations unfortunately inflicted upon an extremely sensitive young man by his coworkers. His response, after continued abuse, was to file in the Circuit Court for Baltimore County two tort actions against his employer and several of his supervisors alleging negligence, defamation, assault, battery, intentional infliction of emotional distress and conspiracy to interfere with contractual relations. The trial judge (Haile, J.) directed verdicts in favor of defendants as to certain counts, joined separate counts, and reformulated those that remained. When the smoke cleared, the jury entered verdicts in the amount of $261,000 against several of the defendants on the only two counts left for their consideration — deceit and assault and battery.

Essentially, the appellants argue on appeal that the

claims are barred by the Workmen's Compensation Act and that even if they are not, the deceit award must be reversed and the assault and battery award must be reversed or reduced. The appellee asserts in his cross-appeal that this Court should remand for a retrial on those counts taken from the jury's province.

The testimony at trial disclosed that Russell Mirabile, appellee and cross-appellant, had worked nearly five years as a trainee and then a claims representative at the Towson branch of Continental Casualty Company (hereinafter Continental) investigating claims, preparing reports and maintaining files. Phillip E. Klingler was the Towson office manager who directly supervised Mr. Mirabile's work. Klinger, in turn, reported to William F. Sheehan, the claims manager of the Silver Spring regional office, and ultimately to Ronald Lewis, the general branch manager of that office.

It was Continental's policy to conduct a uniform annual performance evaluation of all employees, rating ten areas on a scale from 1 to 10, a 5 or 6 being "competent" and a 3 or 4 reflecting a need for improvement. Klingler, as direct supervisor of Mirabile, was responsible for rating Mirabile's performance on a standardized evaluation form and then reviewing the rating with Mirabile, who was to sign the form as an indication that although there might not be agreement, he had been advised of his rated performance status. The completed form was then to be submitted to Mr. Sheehan for final review and acceptance. Following these periodic reviews, a "competent" employee could expect a salary increase. This procedure, as enumerated in the "Performance Review Program" promulgated by Continental, was fully carried out as to Mirabile's performance report for the review period August, 1975, to June 15, 1976, at which time Klingler's overall rating was "needs improvement."

Mirabile's performance review covering the period June 15, 1976, to July 8, 1977, however, was returned to Klingler by Sheehan with a memorandum dated July 18, 1977, stating that after a review of Klingler's comments and Mirabile's light caseload, Sheehan was of the opinion that Mirabile's

overall rating was properly a "needs improvement" rather than "competent" as appraised by Klingler. It also appears that Mirabile's performance, as appraised by Klingler, averaged an overall 3.9, just within the "needs improvement" range, although this was not noted by Sheehan. Sheehan directed Klingler "to review this with Russ Mirabile . . . ."

Rather than resubmit a new or corrected form to Mirabile for his review and signature, Klingler altered the rejected evaluation, making additional comments and changing the overall status to "needs improvement." Sheehan approved the amended evaluation and forwarded it to Lewis, who presumably knew nothing of the alterations, with a recommendation for a five percent pay increase. The recommendation was rejected.

While it seems that Mirabile was not explicitly told that his review was being resubmitted on a "needs improvement" basis, Klingler did advise Mirabile in a memorandum dated August 22, 1977, that:

> "[T]he files were discussed with the deficiencies that were anything but acceptable. The files that were reviewed showed a complete lack of proper investigation, prompt contact, and reporting to the file. This was office-wise and showed a need for improvement on all concerned.
>
> At the time of your recent salary discussion on July 11, 1977, we discussed your areas for needs of improvement. I indicated to you at that time that even though you could answer on the file, the file itself was not responsive to the above criteria, that is prompt contact, proper investigation, and prompt reporting. Also, Russ, I discussed the use of the dictaphone in conveying your investigation in the file, inasmuch as there was some difficulty at times in reading your memos.
>
> Russ, in order that we can be of assistance to you in your career improvement with CNA, I am outlining our plans for improving your performance, which we have already begun some three weeks ago."

Mirabile did not learn of the revision until September or October when he realized that an expected pay raise had not been effected. He demanded that his initial "competent" rating be reinstated. When his supervisors refused, he retained in March 1978, a lawyer who filed on his behalf the initial action, case No. 97761, against Continental, Sheehan, Klingler and Lewis. The four counts charged, respectively, Klingler and Continental with what has been described by the plaintiff as "breach of duty and responsibility," but construed by the judge as fraud or deceit; Lewis, Sheehan and Continental with the same tort; Klingler and Continental with defamation; and all four defendants with conspiracy to interfere with contractual relations.

Although Mirabile's performance became more acceptable as reflected in the "competent" ratings for the periods from July 1 to October 1, 1977; July 7 to October 7, 1977; and July 8, 1977, to April 28, 1978, he contends that a pattern of workplace harassment was at this point initiated.

Mirabile testified that his desk was first moved against a blank wall; then he was assigned by Sheehan to various uncomfortable, inconvenient desks — a desk near a noisy copying machine, a sticky desk that was used as a lunch table, the "wrong side" of another adjuster's desk. With each move his supervisors would "smirk" and "laugh." Mirabile also noticed that he was being sent on distant assignments, files were not being delivered to him from the file room, completed work was disappearing from his case files, and his mail was not always delivered. He further testified that Klingler would often "direct his hum at me . . . hum, hum, hum, hum," put his face rather close, raise his eyebrows, chuckle and walk away. Sheehan called him a "hyena" and on another occasion a "jackass" in the presence of coworkers.

There was also evidence that all employees had to share desks due to cramped conditions; that Mirabile himself would occasionally make bird calls, sing out loud, and make loud sarcastic remarks about the company; and an expert witness testified that Mirabile showed signs of "paranoid thinking."

The culminating incident which prompted Mirabile to stop working and formed the basis of his assault and battery claim occurred on June 27, 1979, after more than a year of such "harassment." The most violent version of the facts follows. On that day Sheehan, having repeatedly asked Mirabile to sit at a desk by himself rather than with Ed Hrica, whose desk he had previously been told to share, became annoyed when he saw Mirabile sitting at Hrica's desk in the morning. He called Mirabile into his office, told him to stay away from Hrica, and at one point "swung his hand into" Mirabile. That afternoon when Sheehan saw Mirabile standing at Hrica's desk making a phone call, Sheehan grabbed the receiver and slammed it down; stood chin to chin with Mirabile, waving his finger in his face and screaming that he had 15 . . . 10 seconds to get out of the area; rushed at Mirabile and started tapping his nose with his finger; repeatedly pushed Mirabile; grabbed Mirabile's arm and pulled him back, saying he was going to fire him. Mirabile, crying "worse than a baby," was so upset and "shocked" that it took him one-half hour to find his car in the parking lot.

He sought comfort of his priest that night and that of a psychiatrist the next day, whom he has continued to see twice a week. Having suffered what three experts agreed was a disabling psychological injury,[1] Mirabile did not return to work and a year later he was terminated. A second tort action, case No. 102985, alleging assault, battery and intentional infliction of emotional distress against Sheehan (Counts 1, 3 and 5) and Continental (Counts 2, 4 and 6) was filed. The last count was eliminated as duplicative by defendants' preliminary objection and the two actions were consolidated at trial.

The plaintiff moved for a directed verdict as to all counts and the defendants did likewise as to all but the assault and battery counts, stating that whether the facts supported an

---

1. While the experts agreed that there was psychological injury to Mirabile, there was disagreement as to whether the injury was permanent. It is interesting to note Mirabile's description of the incidents as having "scared the skills" out of him.

actionable assault and battery was a question for the jury. While it is plain from the record that the trial judge directed verdicts for defendants on the defamation and conspiracy counts, what else was done remains unclear. The judge "denie[d] the motion of defendants Phillip E. Klingler and defendant Continental Casualty for a directed verdict under the second count" of 97761 and "grant[ed] the motion of the defendant, William F. Sheehan and the defendant Ronald Lewis for directed verdict" under that count, but then responded to counsel's inquiry of Counts 1 and 2 of 97761 that he had "already knocked them out."

The jury was then instructed that in the first case the plaintiff claimed "he was injured and damaged by a misrepresentation of fact wilfully made and with malice" and in the second case that "he was injured and damaged by an assault and battery with malice." After being further instructed with numerous exceptions by both counsel on the elements of assault and battery, and, with particularly strenuous exceptions by Mirabile's counsel, on deceit, the jury returned these verdicts. In the "deceit" case, No. 97761, the verdict was $10,000 compensatory damages for Mirabile against Klingler and Continental, with $135,000 punitive damages against Continental and $1,000 punitive damages against Klingler. In the "assault and battery" case, No. 102985, the verdict was $80,000 compensatory damages for Mirabile against Sheehan and Continental, with $25,000 punitive damages against Continental and $10,000 punitive damages against Sheehan.

Defendants' motions for a new trial and for a judgment notwithstanding the verdict were denied and final judgment was entered on the jury's and the directed verdicts.

## I. *Appeal by Continental, Klingler and Sheehan*

### A. *Motion to Dismiss and Scope of Appeal*

Preliminarily, appellee's counsel argues that the appeal should be dismissed, or limited, because appellants entered an order for appeal from the trial court's order passed "in the

above-entitled matters on July 21, 1981," the date of the
court's order denying appellants' motions for a new trial and
for judgment notwithstanding the verdict, and directing the
clerk to enter judgment absolute, rather than from the judg-
ment absolute of July 22, 1981.

Appellants respond that appellee's previous motion to dis-
miss had already been denied by order of this Court on
October 26, 1981. Indeed, this Court has considered
appellee's motion on the grounds that the appeal was
prematurely taken before entry of final judgment and any
appeal should be limited to the trial judge's order of July 21,
1981. While the previous dismissal could not preserve the
appeal if it were not taken from the entry of a judgment
absolute, we are satisfied that the appellants' designation of
the appeal as from the "order of July 21, 1981," was
superfluous language. "The order of appeal would have been
effective had it merely directed the clerk to note an appeal;
it would necessarily follow that it be from the final judg-
ment." *Shipp v. Autoville Limited,* 23 Md. App. 555, 559
(1974). The appeal, properly taken, is not limited to the
denial of appellants' judgment notwithstanding the verdict
and new trial motions.

## B. *Exclusivity of Workmen's Compensation Act*

The threshold issue raised by appellants is whether the
Maryland Workmen's Compensation Act [2] (hereinafter the
Act), which requires an employer to provide compensation
"for the disability or death of his employee resulting from an
accidental personal injury sustained by the employee arising
out of and in the course of his employment," § 15, and the
exclusive remedy provisions thereof, precluded Mirabile's
assault and battery action against his employer and
co-employees.[3]

---

2. Maryland Code (1957, 1979 Repl. Vol., 1980 Cum. Supp.), art. 101.

3. Although the issue was raised in a motion raising preliminary objec-
tion as to the counts in No. 102985, the issue was not raised as to the deceit
or other charges of No. 97761.

The Act embodies a comprehensive scheme for compensation to employees of applicable employers for accidental job related injuries. Compensation under the Act does not require proof of fault and recovery is meant to be exclusive and to preclude tort actions against an employer. § 15. Under § 44, however, the employee may make an election as to pressing his claim under the compensation statute or in a common law tort suit against his employer where the injury is the result of an intentional tort by his employer.[4] Continental argues that, notwithstanding this provision, employees can sue their employers for intentional torts only if the employer in person or someone acting as the "alter ego" of the employer was the actual tortfeasor. In the case of a corporate employer, the tortfeasor must, of course, be the latter. As support, Continental cites a dozen cases from other jurisdictions which have so held, including *Jablonski v. Multack*, 380 N.E.2d 924 (Ill.1978); *Bryan v. Utah International*, 533 P.2d 892 (Utah 1975); *Elliot v. Brown*, 569 P.2d 1323 (Alaska 1977); and *Sands v. Union Camp Corp.*, 559 F.2d 1345 (5th Cir. 1977). This Court has recently decided to follow suit.

In *Schatz v. York Steak House Sys.*, 51 Md. App. 494 (1982), Judge Thompson stated for the Court:

"The majority of jurisdictions that have considered the question have held that absent express authorization by the employer, the agent must be the 'alter ego' of the employer in order for his intentional misconduct to be attributed to the employer. (Citations omitted.) The rationale of these decisions has been succinctly expressed by Professor Larson, in *The Law of Workmen's Compensation*, § 68.21 (pp. 13:10-11 1976) in which he said:

---

4. Section 44 provides as follows:

"If injury or death results to a workman from the deliberate intention of his employer to produce such injury or death, the employee, the widow, widower, child, children or dependents of the employee shall have the privilege whether to take under this article or have cause of action against such employer, as if this article had not been passed."

'When the person who intentionally injures the employee is not the employer in person nor a person who is realistically the alter ego of the corporation, but merely a foreman, supervisor or manager, both the legal and the moral reasons for permitting a common-law suit against the employer collapse, and a substantial majority of modern cases bar a damage suit against the employer.

The legal reason for permitting the common-law suit for direct assault by the employer, as we have seen, is that the same person cannot commit an intentional assault and then allege it was accidental. This does not apply when the assailant and the defendant are two entirely different people. Unless the employer has commanded or expressly authorized the assault, it cannot be said to be intentional from his standpoint any more than from the standpoint of any third person. Realistically, it to him is just one more industrial mishap in the factory, of the sort he has a right to consider exclusively covered by the compensation system.' (footnote omitted)." 51 Md. App. at 496-497.

The rationale is sound and the arguments are strong against allowing a common law tort action against an employer for the intentional torts of a supervisory employee who cannot be said to be the employer's alter ego. To do so would mean that in all tort incidents arising between co-employees, of which there are no doubt a multitude, the plaintiff need only "show that the assailant was one notch higher on the totem-pole than the victim" in order to recover against the employer. 2A Larson, *supra*, § 68.21, p. 13-13. Attribution of employer liability for the actor's conduct should be based on identification rather than agency and is appropriate only where the actual tortfeasor is of such a rank or position that he may be deemed the alter ego of the

employer. Were it otherwise, there would be a subversion of the very purpose of the workmen's compensation scheme of spreading the risk of loss for injuries arising out of and in the course of covered employment, in that an employer would be required not only to provide workmen's compensation but also to defend tort actions of employees.

Where, however, it is neither the employer personally nor someone acting as the alter ego of the employer who commits the intentional tort, there is no justification in holding the employer liable for an employee's intentional acts solely on the principle of *respondeat superior.* This is true notwithstanding the line of decisions reviewed by the Court of Appeals in *Embrey v. Holly,* 293 Md. 128 (1982), which appellee suggests this Court failed to appreciate in *Schatz.* In *Embrey,* at 135, the Court of Appeals characterized its prior decisions as having

> "sided with those which vicariously impose punitive damages on the master for acts of the servant committed during the course of his employment *without regard to whether the master authorized, participated in, or ratified the employee's conduct. See Safeway Stores, Inc. v. Barrack,* 210 Md. 168, 176-77, 122 A.2d 457, 461-62 (1955); *Boyer & Co. v. Coxen,* 92 Md. 366, 368, 48 A. 161, 162 (1901); *Balt. & Yorktown Turn. v. Boone,* 45 Md. 344, 354-56 (1876); *B & O, R.R. Co. v. Blocher,* 27 Md. 277, 286 (1867)." (Emphasis supplied.)

Neither *Embrey* nor the cases cited for support were for the purpose of determining employer responsibility in a workmen's compensation context. Such general tort law principles are not applicable, we think, in the realm of workmen's compensation law. As enunciated by us in *Schatz,* the employee must be the "alter ego" of the employer in order to hold the employer liable for the intentional acts of the employee.

The fact that Sheehan, the claims manager of the Silver Spring office, was Mirabile's supervisor does not alone make

him the alter ego of Continental, a Chicago based corporation. Nothing in the record indicates that Continental directed or authorized the assault or that Sheehan was of such a status in Continental's organization as to be characterized as Continental's alter ego. Under the facts of this case then, Mirabile's assault and battery count against Continental is barred by the Act's exclusivity provision.

Although counsel for Continental purports to be counsel for Sheehan as well, they do not raise the question whether Mirabile's action against Sheehan is also barred under the Act, even though they implicitly acknowledge that there may be circumstances where an action against the supervisor or other co-employee, who is the tortfeasor, will be barred.[5]

## C. Assault and Battery Award

Sheehan next argues that there was no actionable assault and battery and, assuming there was, that a $90,000 award is unconscionable in light of his annual income and the technical nature of the assault and battery. Because we have determined that the exclusive remedy provision of the Act protects Continental from the assault and battery suit No. 102985, Sheehan is liable for the entire $80,000 in compensatory damages awarded by the jury as well as $10,000 in punitive damages.

An assault is any unlawful attempt to cause a harmful or offensive contact with the person of another or to cause an apprehension of such a contact. A battery is its consummation. See Restatement (Second) of Torts §§ 13, 21 (1965); Prosser, Law of Torts, §§ 9, 10 (4th ed. 1971).

---

5. The co-employee may be immune from suit where both the tortfeasor and the victim are acting in the course of their employment. See Nelson v. Harding, 480 P.2d 851 (Colo. 1980). Although such a result has been criticized for allowing a worker who commits an intentional tort to use the compensation law as a shield against liability, see Elliott v. Brown, 569 P.2d 1323 (Ala. 1977), each employee, as quid pro quo for having given up his own right to common law suits, can expect freedom from common law suits based on industrial accidents which are his fault. See Larson, supra, § 72.22 et seq. at 14-86 et seq.

Sheehan first asserts that the essential element of threat of a harmful or offensive contact was not present, citing as support *Brown v. Stauffer Chemical Co.,* 539 P.2d 374 (Mont. 1975), wherein it was held that plaintiff's work place supervisor did not commit an actionable assault and battery when he called plaintiff "sweetheart" and gave him "pats on the rear."

While it may be true that "the law disregards trifles," *Brown,* 539 P.2d at 376, we think there was sufficient evidence from which this jury could have concluded that such a threat existed. Appellants' counsel conceded at trial that the assault and battery claim, which it characterized as a "pushing and shoving incident," was an issue of credibility to be determined by the jury. It cannot now be reviewed on appeal.

Even assuming an actionable claim was stated, nominal damages at most were appropriate, appellants continue; the battery, technical in nature, calls for a technical damage award.[6] It is well settled, however, that the question of whether a verdict is excessive is not open on appeal. *Patapsco Loan Co. v. Hobbs,* 134 Md. 222, 227 (1919); *Kirkpatrick v. Zimmerman,* 257 Md. 215, 218 (1970). Even if it is our judgment that an award of $80,000 for compensatory damages in this case were excessive in light of the evidence, we are barred from reversing or reducing the judgment.

The case of *Heinze v. Murphy,* 180 Md. 423 (1942), is not to the contrary. Appellants mistakenly rely on *Heinze* as authority for this Court to reduce a damage award as excessive. The Court of Appeals merely found that since malice had not been established, the case did not justify punitive damages, but it affirmed the judgment for compensatory damages. They were not reducing damages as excessive but

---

6. Because Sheehan's counsel do not raise the issue of whether punitive damages were appropriate at all, we shall not address the question of whether there was malice on the part of Sheehan such as will sustain a punitive damage award. *See* Carl M. Freeman Assoc., Inc. v. Murray, 18 Md. App. 419, 425-428 (1973).

rather were throwing out a punitive damage award *in toto* as inappropriate. That another court has found the authority to do so, *see Brown v. Stauffer Chemical Co.,* 539 P.2d 374 (Mont. 1975), is not persuasive. As a creature of statute, this Court has no inherent powers to reduce a damage award nor has any persuasive source of authority to do so been cited to us.

### D. *Deceit Award*

Appellants' grounds for appeal as to the deceit award 1) that the claim against Continental is barred by the exclusivity provision of the Workmen's Compensation Act; 2) that the trial court erroneously refused to direct a verdict after Mirabile failed to establish the factual elements of a deceit claim; 3) that the court improperly submitted the issue of punitive damages on that claim to the jury; and 4) that the court permitted an unconscionable award to stand have become moot with Mirabile's $146,000 concession at oral argument that there was no deceit claim and no legally sufficient evidence to establish the elements of deceit. The judgments entered against Continental and Klingler on the jury's verdict on the deceit charge must be reversed.

### II. *Cross-Appeal by Mirabile*

### A. `Directed Verdicts`

Addressing now the issues Mirabile raises in his cross-appeal, appellee asserts that the trial judge should not have directed a verdict on his claims for damages resulting from appellants' alleged defamation, interference with a contractual relationship and intentional infliction of emotional distress, and asks that we remand for a full trial on all counts.

The directed verdict standard applied in Maryland requires that we consider the evidence in a light most favorable to the nonmoving party and interpret every rea-

sonable inference in its favor. *Impala Platinum v. Impala Sales,* 283 Md. 296 (1978). If there is any legally relevant and competent evidence, however slight, from which a rational mind could infer a fact in issue, then a trial court would be invading the province of the jury by declaring a directed verdict. *Impala, supra* at 328; *Ralph Pritts & Sons, Inc. v. Butler,* 43 Md. App. 192, 199-200 (1979).

## 1. *Defamation Count*

The Court of Appeals has held that a false and defamatory statement published by an employer concerning his employee is actionable absent a qualified privilege. *Jacron Sales Co. v. Sindorf,* 276 Md. 580 (1976). While appellee asserts that the defamatory statement was the knowingly false misimpression that Mirabile had seen and acknowledged his "needs improvement" rating, it is in no way defamatory. Such a "misimpression" cannot be said to have exposed Mirabile to hatred, contempt, ridicule, aversion or disgrace, or have put him to expense or inconvenience as a consequence of the language. *See Cheek v. J.B.G. Properties, Inc.,* 28 Md. App. 29, 33 (1975). The misimpression was merely that Mirabile had acknowledged the lower performance rating when, in fact, he had not. It is true that Mirabile, as a result of the ratings, may have been denied a pay raise, but it was denied not because he was thought to have acknowledged his "needs improvement" rating but because *he was* officially rated "needs improvement."

Nor can the actual rating of Mirabile as "needs improvement" be considered the defamatory statement. An otherwise defamatory statement is not defamation where true. A complete reading of the infamous evaluation form, on its face, leads us to the conclusion that an overall "needs improvement" status was initially appropriate, given the 3.9 average of the individual skill ratings. For these reasons, a directed verdict was entirely appropriate.

## 2. *Wrongful Interference with Contractual Relationship Count*

A third party who, without legal justification, intentionally interferes with the rights of a party to a contract, or induces a breach thereof, is liable in tort to the injured contracting party. *Wilmington Trust Co. v. Clark,* 289 Md. 313, 329 (1981). Recovery is not permitted, however, where the defendant is a party to the contract. *Wilmington Trust Co., supra* at 329. The tort contemplates the interference of two parties' contractual relations by a third party. Appellee, in the same declaration in which he alleges wrongful interference with contractual relations, alleges that Klingler, Lewis and Sheehan "were acting as the agent[s], servant[s] and employee[s]" of Continental. Klingler, Lewis and Sheehan cannot be Continental's agents for the purposes of the first three counts and not for the purpose of the fourth count. Because they were acting as Continental's agents, they cannot be considered third parties and the claim must fall. The trial court acted appropriately in directing the verdict on this count.

## 3. *Intentional Infliction of Emotional Distress Counts*

Regarding appellee's claim that he is entitled to a retrial on his intentional infliction of emotional distress count against all appellants, we are of the opinion that in two of the three counts, the tort has not been clearly, concisely and adequately raised. Count 1 of No. 97761, directed at Klingler and Continental, alleges that the defendants intentionally and maliciously breached "an obligation and duty to fairly report" Mirabile's performance and that they made "negligent, false and malicious statements," and Count 2 reincorporated those allegations. It is a basic requirement of Maryland pleadings that "[s]eparate causes of action shall be contained in separately numbered counts." Maryland Rule 340 c. Such a pasticcio of allegations falls woefully short of that requirement.

The remaining count by which appellee attempts to allege intentional infliction of emotional distress — Count 5 of No. 102985 — successfully does so, but only against Sheehan. Although Count 6 of that declaration, setting out identical allegations with respect to Continental, was eliminated by preliminary objection as duplicative of Counts 1 and 2 of No. 97761, Count 5 apparently was not.[7] We must, therefore, determine whether a rational conclusion could have been drawn favorable to the appellant on the intentional infliction of emotional distress count, thus requiring its submission to the jury.

The newly fashioned tort of intentional infliction of emotional distress, first recognized in this State in *Harris v. Jones,* 35 Md. App. 556, *aff'd,* 281 Md. 560 (1977), requires these elements:

    (1) intentional or reckless conduct;
    (2) extreme and outrageous conduct;
    (3) a causal connection between the wrongful conduct and the emotional distress; and
    (4) emotional distress of a severe nature.

*Harris v. Jones,* 281 Md. at 566. We find it necessary to address only the second element, *i.e.,* whether Sheehan's conduct may reasonably be regarded as extreme and outrageous under the definition of the tort.

The Restatement (Second) of Torts § 46, Comment d (1965), states that

> "liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community

---

7. Appellee, however, seems to think that it was. He notes an appeal from, *inter alia,* the "[grant of] appellants' motion raising preliminary objection as to Counts V and VI."

> would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous.'
>
> The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind."

It is true that conduct which is not otherwise extreme and outrageous may become so where the actor is aware that the individual to whom the conduct is directed is particularly sensitive to emotional distress, *Harris v. Jones,* 281 Md. at 568, and that a plaintiff's status as an employee may entitle him to a greater degree of protection from insult and outrage than if he were a mere stranger. *Alcorn v. Anbro Engineering, Inc.,* 468 P.2d 216 (Cal. 1970), cited in *Harris v. Jones,* 281 Md. at 567.

Yet it is to be remembered by the courts when determining in the first instance whether a defendant's conduct may reasonably be regarded as extreme and outrageous, that, in the words of Professor Calvert Magruder, "[n]o pressing social need requires that every abrasive outburst be converted into a tort; upon the contrary, it would be unfortunate if the law closed all the safety valves through which irascible tempers might legally blow off steam." *Mental and Emotional Disturbance in the Law of Torts,* 49 Harv. L. Rev. 1033 (1936), quoted with approval in *Harris v. Jones,* 281 Md. at 568. Rather, "major outrage is essential to the tort...," § 46, Restatement, Comment f.

The facts here are not such as could lead a rational trier of fact to conclude that Sheehan's conduct was extreme and outrageous under this test. The circumstances are not comparable to those in *Alcorn v. Anbro, supra,* wherein plaintiff's employer shouted at him in a rude, violent and insolent manner, "You Goddam 'niggers' are not going to tell me

about the rules. I don't want any 'niggers' working for me. I am getting rid of all the 'niggers'; go . . . get your paycheck, you're fired"; or in *Agis v. Howard Johnson Co.,* 355 N.E.2d 315 (Mass. 1976), where plaintiff was summarily fired pursuant to the employer's announced intention of firing his waitresses in alphabetical order until he could determine who was stealing from his restaurant. *See also Boyle v. Wenk,* 392 N.E.2d 1053 (Mass. 1979).

Various courts, on the other hand, have determined that the defendant's conduct was not so outrageous as to support an action for the intentional infliction of emotional distress where a police officer told the plaintiff that he was as crazy as a bedbug and would be put back in an asylum and his children taken from him; and another officer puffed up his cheeks and bulged his eyes seven or eight times at the plaintiff, *Pakos v. Clark,* 453 P.2d 682 (1969); or where a supervisor reprimanded the plaintiff, a paraplegic, and told him that his job was created because of his handicap, *Paris v. Division of State Compensation Ins. Fund,* 517 P.2d 1353 (Colo. 1973).

Summarily stated, the evidence in Mirabile's favor was that Sheehan moved him from desk to desk, yelled and screamed at him to move away from a particular desk, and may have tapped him on the nose and pushed him.

Applying the above enumerated principles of law and looking to settled cases for guidance, we are of the opinion that no rational trier of fact could conclude that Sheehan's actions were more than rude and violent and amounted to extreme and outrageous conduct, particularly in light of what might have been equally rude provocation by Mirabile. The verdict as to this count was properly directed in appellants' favor.

B. *Evidentiary Rulings*

Mirabile lastly raises two evidentiary issues: that the trial court erred in 1) refusing to permit the jury to grant damages for permanent injury and 2) admitting evidence of appellee's receipt of disability and medical benefits in violation of the "collateral source" rule.

We note that Mirabile's order for cross-appeal was from the final judgment "insofar as that judgment" in case No. 97761 directed verdicts in defendants' favor as to Counts 1, 3, and 4 and was in favor of Sheehan and Lewis as to Count 2 and "insofar as that judgment" in case No. 102985 directed verdicts in defendants' favor as to Counts 1 and 2 and granted defendants' motions raising preliminary objections as to Counts 5 and 6.[8]

While we stated in *Shipp v. Autoville Limited,* 23 Md. App. 555 (1974), that an effective appeal is noted where the order directs a clerk to note an appeal, we did there note the caveat that "if there are two or more appealable judgments in a cause, an appellant designating one would be bound by the declaration." 23 Md. App. at 560, n. 4. As enunciated by the Court of Appeals in *Carter v. State,* 286 Md. 649 (1979), limiting the breadth of the appeal in this manner opens for appellate review only the issues mentioned in the requested order. The propriety of the two rulings is not properly before us.

> *Judgment as to deceit award, reversed as to all defendants; judgment as to assault and battery award, reversed as to Continental Casualty Co., and affirmed as to William F. Sheehan; judgment as to all other counts entered on directed verdict, affirmed.*
> *Costs to be divided equally between William F. Sheehan, appellant, and Russell R. Mirabile, appellee and cross-appellant.*

---

8. In fact, as noted above, it is not clear that the judge declared a directed verdict as to Count 1 of No. 97761 or Counts 1 and 2 of No. 102985, or that he granted defendants' motion raising preliminary objection as to Count 5 of No. 102985.