LUTTIG, Circuit Judge,
concurring in part and dissenting in part:
I join Part II of the majority opinion, affirming the district court’s dismissal of Gantt’s sexual harassment claim. I also concur in Part III, insofar as it reverses the district court’s order of summary judgment as to the emotional injuries suffered by Gantt as she waited outside at Post 9.
I dissent, however, from the majority’s affirmance of the district court’s order dismissing Gantt’s claim against Security USA for the emotional distress she suffered as a result of her abduction, torture and rape, as barred by the Maryland worker’s compensation laws. In my judgment, Gantt has presented sufficient evidence to support a jury verdict that Security USA, acting through supervisor Claggett, “deliberately intended” for Gantt to be abducted, tortured and raped by Sheppard and to suffer the severe emotional injuries that resulted therefrom. Therefore, I would hold that this portion of Gantt’s claim for intentional infliction of emotional distress may be brought by Gantt outside of the provisions of the Maryland workers’ compensation laws.
I.
The majority holds, and I agree, that Gantt presented sufficient evidence to withstand summary judgment on each of the elements of her tort claim for intentional infliction of emotional distress against Security, USA for her injuries from the abduction, torture and rape. See ante at 554-55, 503 A.2d 708. It nevertheless affirms the district court’s order dismissing Gantt’s claim as to these injuries because it holds that Gantt did not present sufficient evidence to bring herself within the terms of the exception to the Workers’ Compensation Act’s general prohibition on employee suits for workplace injuries outside the workers’ compensation scheme. See Md.Code Ann., Lab. & Empl. § 9- *562 509(a), (b). The exception, set forth in Md.Code § 9 — 509(d), provides that Gantt “may bring an action for damages against her employer” if she demonstrates that she was injured “as the result of the deliberate intent of [her] employer to injure” her. See Md.Code Ann., Lab. & Empl. § 9 — 509(d); Johnson v. Mountain Farms of Delmarva, Inc., 305 Md. 246, 503 A.2d 708, 712 (1986).
In holding that Gantt has not presented evidence from which a reasonable jury could conclude that Security USA “deliberately intended” to injure Gantt, I believe the majority has failed to draw reasonable inferences from the evidence, taken in the light most favorable to Gantt, and, in so doing, decided itself a factual question that should have been left to a jury instead.
Claggett, Gantt’s supervisor, and Sheppard, her former boyfriend and attacker, were friends from work and they often discussed Sheppard’s relationship with Gantt. Claggett knew that Sheppard had previously abused and threatened to kill Gantt. She knew that Sheppard was barred by court order from having any contact with Gantt. And she knew that, by order of manager Earl Wood, Gantt was not to be stationed at an outside post, in order that she be protected from Sheppard. Yet, on the very morning in question, Claggett ordered Gantt to report to post 9, an outside post, ignoring both the instructions given to her only a few minutes earlier by Willie Jones, the supervisor that preceded her, and Gantt’s own pleas that she would not be safe if located at post 9. Then, within fifteen minutes of Gantt assuming post 9, Claggett knowingly violated the protective order against Sheppard and transferred a telephone call from him to Gantt. Alarmed by Sheppard’s call, Gantt again pleaded with Claggett that she be transferred from post 9 to an inside post where she would not be vulnerable. Claggett rebuffed Gantt, insisting that she remain at post 9. Less than an hour later, Sheppard arrived at post 9 and kidnapped Gantt at gunpoint. When told that Gantt had been abducted at gunpoint and was being driven away in a van, Claggett even still refused to intervene to protect Gantt by calling the police, instructing other employees not to be alarmed.
A reasonable jury could take Claggett at her word, as both the majority and Judge Niemeyer appear to do, and conclude from these facts that she intended nothing more than for Sheppard to talk to Gantt at her post on the morning in question, and, therefore, that her obstinate disregard of both Sheppard’s threats and the repeated admonitions of her immediate supervisor, the supervisor that she replaced, and Gantt herself amounted only to “misguided judgment” or “recklessness” in light of the danger Sheppard posed to Gantt.
But a reasonable jury need not reach such an innocent conclusion as to Clag-gett’s motivations. It could just as readily find that Claggett acted intentionally and in concert with Sheppard on the morning in question, not, as Judge Niemeyer contends, as a “counselor or peacemaker” to Gantt and Sheppard. Ante at 561, 503 A.2d 708 (opinion of Niemeyer, J.). Such a jury could draw the inference that it was not mere coincidence that Sheppard arrived at post 9 at 7 a.m. on the same morning that, just an hour earlier, Clag-gett had stationed Gantt at that same post, but, instead, that Sheppard arrived there because Claggett had arranged with Sheppard for him to have access to Gantt at that time and place. It could also infer that Claggett refused Gantt’s pleas to be moved to an inside post for the very reason that Claggett did intend to facilitate Sheppard’s access to Gantt. Such a jury could further determine that when Clag-gett, having just been told by frantic secu *563 rity guards that Sheppard abducted Gantt at gunpoint, assured her fellow guards, “no, we don’t need to call the police because [Sheppard] doesn’t want to hurt her, he just wants to talk to her,” she spoke, not because she actually believed that such was Sheppard’s purpose, but, rather, to prevent those guards from interfering with Sheppard’s abduction of Gantt. And that Claggett ultimately called the police herself five to ten minutes later, not because she suddenly became convinced that Sheppard may have something else in mind, but rather because she surmised (correctly) that, by this time, Sheppard would have had the opportunity to leave the premises' with Gantt.
These inferences are not, of course, compelled, but each would be well-supported by the evidence in this case. And, were a jury to so conclude, it could determine that Claggett’s actions, taken as a whole, demonstrated a deliberate intent “to bring about the consequences of [her] act[s],” see Johnson, 503 A.2d at 712, Gantt’s abduction, torture and rape, as well as the emotional injuries that attended each.
On this basis, I would reverse the district court’s judgment outright and remand for trial.
II.
Judge Niemeyer suggests an additional reason that Gantt may not proceed with her claim outside of the provisions of the Workers’ Compensation Act, namely, that Claggett’s actions cannot be imputed to Security, USA because “Claggett was the lowest level supervisor of the New Carrol-ton building” and her actions were “not only unauthorized, but expressly disallowed” by a superior’s order. See ante at 20, 503 A.2d 708 (opinion of Niemeyer, J.). The majority opinion dismisses this suggestion in a footnote for the entirely valid reason that Security USA itself has not attempted, either before the district court or on appeal, to disavow that Claggett was acting as its agent in stationing Gantt at an outside post. See ante at 13 n. 3, 503 A.2d 708. But in any event, in so contending, Judge Niemeyer distorts the law of Maryland, as set forth by the Maryland Court of Appeals in Federated Dep’t Stores Inc. v. Le, 324 Md. 71, 595 A.2d 1067 (1991).
The Maryland courts have not, contrary to Judge Niemeyer’s assertion, “historically restricted liability to acts authorized by the employer or performed by the employer’s alter ego.” Ante at 29, 595 A.2d 1067 (Opinion of Niemeyer, J.). In fact, when the Maryland Court of Appeals considered the question over a decade ago, it did not merely “cast doubt” on the alter ego approach. It expressly declined to read the Maryland Workers’ Compensation Act to require a showing that the employee was the “alter ego” of the employer, rejecting the approach taken in Schatz v. York Steak House Sys., Inc., 51 Md.App. 494, 444 A.2d 1045 (1982) and Cont’l Cas. Co. v. Mirabile, 52 Md.App. 387, 449 A.2d 1176 (1982). See Le, 595 A.2d at 1074 (holding that the “intent to injure” exception to the general exclusivity of the workers’ compensation act does not “embodyf ] the particular restriction upheld ... in Mirabile and Schatz”). Moreover, the Le court made clear that the act in question need not be taken by an employee with the “express authorization]” of the employer itself before it could be imputed to that employer. Id.
Finally, while Le did state that, “it may well be that the General Assembly, by the language ‘deliberate intention of his employer to produce such injury,’ intended something less than the full sweep of common law respondeat superior liability,” id., there is nothing in the Maryland case law to suggest that the legislature intended to *564 protect an employer from suit where, as here, its supervisor acted, as a supervisor, in the normal course of her employment, with the deliberate intent to injure another employee — simply because that supervisor’s action violated the order of an absent, higher-ranking company official. Cf. Hastings v. Mechalske, 336 Md. 663, 650 A.2d 274, 281 (1994) (holding that, “the employer remains liable with respect to the duty, regardless of the acts or omissions of the person entrusted to perform it”). Nor would such a rule be wise. Whether or not there were other people above Clag-gett in the Security, USA hierarchy, there is no question that, on the morning of Gantt’s abduction, Claggett was the supervisor in charge of the New Carrolton building for Security, USA. As an employee of Security, USA, Gantt had no choice but to abide Claggett’s orders; there were, after all, no higher-ranking authorities present to whom Gantt could appeal. That Claggett’s order represented the order of her employer is the only reason that Gantt remained outside at post 9, in fear for her life.
Moreover, were we to hold that a supervisor’s actions could not be imputed to an employer whenever the employer had a standing policy against the action taken by a supervisor, it would render the “intent to injure” exception to exclusivity set forth in section 509(d) a near nullity, relevant only to those rare occasions when an employer did not have a policy of some sort forbidding actions taken with a “deliberate intent” to kill or injure another employee. Without any guidance in the statutory text or the caselaw, I would never so restrictively interpret this provision.