PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

DOMINIQUE K. GANTT,
            *Plaintiff-Appellant,*

v.

SECURITY, USA, INCORPORATED,
Corporate Office,
            *Defendant-Appellee,*

and

VSI, INCORPORATED, formerly known
as Security, USA, Incorporated, its
agents, employees and
representatives; TIM WELDON,
President; ANGELIA CLAGGETT, Shift
Supervisor; GARY SHEPPARD, Inmate
#266463; EARL WOOD, Project
Manager and Resident Agent,
            *Defendants.*

No. 03-1033

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Deborah K. Chasanow, District Judge.
(CA-00-637-8-DKC)

Argued: September 26, 2003

Decided: January 23, 2004

Before NIEMEYER, LUTTIG, and MOTZ, Circuit Judges.

---

Affirmed in part and reversed and remanded in part by published
opinion. Judge Motz wrote the opinion, in which Judge Niemeyer and

Judge Luttig concurred in part and dissented in part. Judge Niemeyer wrote an opinion concurring in Part II and dissenting from Part III and dissenting from the judgment. Judge Luttig wrote an opinion concurring in Part II and a portion of Part III, and dissenting from a portion of Part III and from part of the judgment.

## COUNSEL

**ARGUED:** Dawn Valore Martin, LAW OFFICES OF DAWN V. MARTIN, Washington, D.C., for Appellant. Michael Sumner Levin, DIRSKA & LEVIN, Columbia, Maryland, for Appellee. **ON BRIEF:** F. Nash Bilisoly, Arlene F. Klinedinst, Christopher Ambrosio, VANDEVENTER BLACK, L.L.P., Norfolk, Virginia, for Appellee.

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

Dominique Gantt informed her employer, a private security company, that she had obtained a protective order barring her former boyfriend from any contact with her. But Gantt's supervisor, apparently believing that the estranged couple "should talk," permitted the boyfriend access to Gantt. The boyfriend then, at gunpoint, kidnaped Gantt from her work place and held her captive for six hours, assaulting and raping her. Gantt brings this action against her employer seeking damages for her resulting severe emotional and mental distress; she asserts that her employer violated its Fifth Amendment duty to prevent sexual harassment in the workplace and intentionally inflicted emotional distress upon her. Because no Fifth Amendment claim lies against a private entity, we affirm the district court's dismissal of this claim. However, the district court erred in its analysis of Gantt's emotional distress claim; accordingly, we must reverse part of its grant of summary judgment to the employer on this ground, and remand for further proceedings.

I.

On November 6, 1996, upon finding that Gary R. Sheppard had caused Gantt serious bodily harm by "repeated acts of violence," a

Maryland court granted Gantt a protective order. The protective order barred Sheppard from abusing, threatening, or contacting Gantt anywhere — including her home or "place of employment" — and by any means — in person, on the telephone, or in writing.

The next day, Gantt notified her employer, Security, USA, Inc., of the protective order and even brought a copy of the order to officials at Security USA for their examination. Security USA Project Manager Earl Wood then notified all Security USA supervisors that Gantt should only be assigned to secured inside posts so that Sheppard could not gain access to her at work.

Sheppard, who worked as a security officer at another private security company, Wackenhut Services, was "weapon qualified"; that is, he was trained and qualified to use a gun. At Wackenhut, Sheppard worked during the week with Sgt. Angela Claggett, who supervised Gantt at Security USA on weekends. Sgt. Claggett acknowledged that she had a "friendly relationship" with Sheppard.

Sgt. Claggett testified that Security USA Manager Wood told her when Gantt obtained a protective order against Sheppard, and that Sgt. Claggett had been directed to move Gantt to an "inside location at the loading dock." Gantt, herself, also talked with her supervisor, Sgt. Claggett, about the protective order. Sgt. Claggett reported that Gantt told her that Sheppard "hit her [Gantt] and that this hadn't been the first time and she was tired of it and didn't want to go through it anymore." In addition, Sgt. Claggett acknowledged that she knew Sheppard had attempted to break into Gantt's mother's house while Gantt was there. Gantt testified that she told Sgt. Claggett that Sheppard threatened to kill her if she did not "drop the charges . . . from the previous incident at my mother's house."

Other sources confirmed what Gantt had told Sgt. Claggett. Sheppard himself talked with Sgt. Claggett about the protective order and his conduct. He acknowledged that he had "put [his] hands" on Gantt but claimed that he "loved her." According to Sgt. Claggett, she told Sheppard that he "shouldn't have done that" but that "it's understandable" and "you all need to talk." Sgt. Claggett also testified that she had heard that Sheppard threatened to "kill himself, his children, his wife and Ms. Gantt."

Despite Sgt. Claggett's admitted knowledge of Sheppard's abuse of Gantt and threats to kill her, in November (after issuance of the protective order) when Sheppard telephoned Gantt at work, Sgt. Claggett took the call and urged Gantt to talk to Sheppard. Gantt refused, saying "[h]e's not supposed to be calling me at my job." Sgt. Claggett responded, "just talk to him" and transferred the call immediately to Gantt. After telling Sheppard "[p]lease don't call again . . . I'll notify the court" and hanging up on him, a distressed Gantt reported Sgt. Claggett's conduct to Project Manager Wood. Nonetheless, Sgt. Claggett later in November transferred still another call from Sheppard to Gantt, saying "all he wants to do is talk to you."

On the first Saturday of the next month, December 7, 1996, at 6:00 A.M., Gantt reported to work for Security USA at the Internal Revenue Service building in Lanham, Maryland. Sgt. Claggett was the "senior person in charge"; no one else at the site was "above Ms. Claggett." Sgt. Willie Jones, concluding his shift and being replaced as the supervisor by Sgt. Claggett, reminded Claggett that "we got to leave Dominique [Gantt] inside." Yet after Sgt. Jones left, Sgt. Claggett ordered Gantt to assume unsecured Post #9 *outside* the building. Gantt tried to refuse, reminding Sgt. Claggett "you know this stuff is still going on and . . . I am supposed to be inside." Sgt. Claggett ordered Gantt "to go right to" Post #9 and "just got louder and louder" as she did so. Finally, Gantt obeyed Claggett and went outside to unsecured Post #9.

Within fifteen minutes of Gantt assuming her assignment at Post #9, Sheppard telephoned her at her work station. Gantt testified that the phone's display indicated that Sheppard's call was transferred to her from Sgt. Claggett's inside extension. During the brief telephone call, Sheppard was "really mean" to Gantt and she hung up on him. Distraught, Gantt then telephoned Sgt. Claggett, told her Sheppard had "just called" and that Gantt "wanted to be moved to an inside post." Sgt. Claggett refused to permit Gantt to move inside to safety.

At approximately 7:00 A.M., Sheppard arrived at the IRS building and proceeded to Gantt at Post #9. Gantt ran from Post #9 toward an entrance to the IRS building in search of safety. Sheppard pulled a shotgun from his trench coat and with the gun drawn and aimed at Gantt, chased her through the area surrounding Post #9, shouting

"Run! Run!" Sheppard chased Gantt until he caught her, then grabbed her by her arm, and pressing the shotgun against her chin, placed her in a choke hold. Sheppard dragged Gantt along an outside area of the IRS building, off the premises, and into his van.

Two security guards at the IRS building witnessed Sheppard kidnap Gantt. One of these guards, in the presence of Officer Darren Harvey, reported Gantt's abduction at gunpoint to Sgt. Claggett. When it was suggested that the police be called, Harvey testified that Sgt. Claggett said "no, we don't need to call the police because he doesn't want to hurt her, he just wants to talk to her." Someone eventually did call the police. At her deposition, Sgt. Claggett testified that she did so, but acknowledged that she did not call until "five to ten minutes" after the abduction, even though she conceded that she knew that five or ten minutes can mean the difference between life and death when someone is held at gunpoint.

Sheppard held Gantt captive for six hours, driving through Maryland, Delaware, and the District of Columbia to evade police. He raped and physically and verbally terrorized Gantt, threatening to kill her with his shotgun. Gantt repeatedly begged for her life and eventually convinced Sheppard that she would reconcile with him and tell the police she went with him willingly. Sheppard then hid his shotgun and surrendered to the police.

Sheppard was convicted in state court of kidnaping, first degree rape, and violation of the restraining order. The court sentenced him to twenty years imprisonment.

When Gantt returned to work at Security USA, she told Project Manager Wood and Internal IRS investigative officers she believed that Sgt. Claggett bore responsibility for Sheppard's assault of her. Wood never responded to or acted on this complaint. Instead, Security USA permitted Claggett to maintain her supervisory duties and rank as sergeant and, when on Sgt. Claggett's shift, Gantt had to report to her.

On December 2, 1999, Gantt filed suit in state court against Security USA; the company removed the case to federal court. Gantt alleges that as a result of the events of December 7, 1996, she has suf-

fered physical injury, severe emotional distress, "recurring nightmares and other mental health issues, which have dramatically reduced her quality of life." She contends that she has undergone "medical evaluation and treatment," incurred medical expenses, and lost wages. Although Gantt alleged a number of theories of recovery in her complaint, she only appeals the district court's rejection of her sexual harassment and intentional infliction of emotional distress claims. We consider each in turn.

## II.

Gantt contends that the district court erred in dismissing her sexual harassment claim. Specifically, she maintains that Security USA "fail-[ed] to take reasonable steps to end, and indeed facilitated, the sexual harassment by Sheppard, creating a hostile work environment." Brief of Appellant at 14.

In her complaint, Gantt alleged that in so failing, Security USA violated the Fifth Amendment of the United States Constitution, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e (2000), and Article 49B of the Maryland Annotated Code, Md. Code Ann., § 49B (1998). The district court dismissed her statutory claims, reasoning that Gantt failed to exhaust her administrative remedies, a prerequisite for a Title VII claim, and that Article 49B does not create a private cause of action of sexual harassment. Gantt does not appeal those dismissals. Thus, as Gantt recognizes, the only possible basis for her sexual harassment claim is the Constitution. As she also recognizes, in order to state a constitutional claim, she must allege facts, which, if proved, would establish Security USA is a governmental actor.

Gantt has attempted to satisfy this requirement by alleging that Security USA "acted as an agent or instrumentality of the United States government to protect persons and property on the premises of the IRS building" and so had a Fifth Amendment duty to protect her from workplace sexual harassment.[1] In *Bivens v. Six Unknown Fed.*

---

[1]On appeal, Gantt seeks to widen the legal basis of her constitutional claim, contending that she has alleged a "violation of the Fifth *and* Fourteenth Amendments of the Constitution, guaranteeing equal protection

*Narcotics Agents*, 403 U.S. 388 (1971), the Supreme Court did recognize an implied private action for damages against agents of the United States alleged to have violated a citizen's constitutional rights. However, the Court has specifically declined to "extend this limited holding to confer a right of action for damages against *private entities* acting under color of federal law." *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 66 (2001) (refusing to allow a *Bivens* claim against a halfway house operated by private entity under contract with the Bureau of Prisons) (emphasis added). Indisputably, Security USA is a private entity; therefore no *Bivens* claim lies against the company. For this reason, the district court properly dismissed Gantt's constitutional sexual harassment claim against Security USA.

## III.

Gantt's intentional infliction of emotional distress claim presents a more complicated question. Although the district court denied Security USA's motion to dismiss this claim, the court ultimately granted the company summary judgment on the claim. We believe the court erred in doing so.

## A.

The district court correctly recognized, that in Maryland (as in many other jurisdictions) a claim of intentional infliction of emotional distress has four elements:

> (1)   The conduct must be intentional or reckless; (2) [t]he conduct must be extreme and outrageous; (3) [t]here must

---

under the law pursuant to 42 U.S.C. § 1983." Brief of Appellant at 14 (emphasis added). We must reject this contention. Not only has Gantt failed to invoke the Fourteenth Amendment or § 1983 in her complaint, but she has also failed to assert any facts in the complaint giving rise to Security USA's liability as a *state* actor. Rather, Gantt's case for governmental action hinges on her allegations that Security USA acted under color of *federal* law. Moreover, the arguments Gantt asserts in her appellate briefs would not establish state action, even if she had alleged the necessary underlying facts in her complaint.

be a causal connection between the wrongful conduct and the emotional distress; (4) [t]he emotional distress must be severe.

*Manikhi v. Mass Transit Admin.*, 758 A.2d 95, 113 (Md. 2000) (internal quotation marks and citations omitted).

In its seminal case recognizing intentional infliction of emotional distress as a valid tort in Maryland, the state's highest court relied on Restatement (Second) of Torts § 46, comment i (1965) to explain the first element:

the defendant's conduct is intentional or reckless where he desires to inflict severe emotional distress, and also where he knows that such distress is certain, or substantially certain, to result from his conduct; or where the defendant acts recklessly in deliberate disregard of a high degree of probability that the emotional distress will follow.

*Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977); *accord*, *B.N. v. K.K.*, 538 A.2d 1175, 1180 (Md. 1988); *see also*, *Kentucky Fried Chicken Nat'l Mgmt. Co. v. Weathersby*, 607 A.2d 8, 17 (Md. 1992) ("We apply the law of intentional infliction of emotional distress as we adopted it nearly 15 years ago in *Harris v. Jones*."); *Foor v. Juvenile Services Admin.*, 552 A.2d 947, 959 (Md. Ct. Spec. App. 1989) (explaining that to meet the first element a plaintiff must offer evidence that "the defendant either *desired* to inflict severe emotional distress, *knew* that such distress was *certain or substantially certain* to result from his conduct, or acted recklessly in deliberate disregard of *a high degree of probability* that the emotional distress will follow." (emphasis in original)).

The district court properly stated and applied this standard in concluding that Gantt had satisfied the first element of the tort with respect to one portion of her intentional infliction of emotional distress claim. The court reasoned that Gantt:

has forecasted evidence that Claggett's assignment of Plaintiff [*i.e.* Gantt] to Post 9 was an intentional act given that

Claggett was aware that Sheppard has talked about killing Plaintiff, that Plaintiff was afraid of Sheppard, and that she had obtained a restraining order against him. Looking at the evidence in the light most favorable to the Plaintiff, one could conclude that Claggett intentionally assigned Plaintiff to a post where she knew Plaintiff would be in fear and then refused Plaintiff's requests to leave the post after Sheppard called her there.

This conclusion seems unassailable. However, turning to the third and fourth elements, the court rejected Gantt's intentional infliction of emotional distress claim, concluding that the emotional distress actually caused by Claggett's intentional conduct — which the court determined to be "the fear she suffered *while waiting at the post*" — did not meet "the high burden imposed by the requirement that a plaintiff's emotional distress be severe." (emphasis in original and internal quotation marks and citation omitted). This was error.

The court artificially restricted the emotional distress caused by Claggett's intentional conduct to the fear Gantt experienced while waiting at the post, ignoring the fact that Gantt has testified that the hour she spent waiting in fear of Sheppard's arrival had a longer-term emotional impact. Gantt has alleged not just that her abduction and rape caused severe emotional distress, but generally that "[a]s a result of the injuries sustained on December 7, 1996," she has been caused "recurring nightmares and other mental health issues which have dramatically reduced her quality of life." Gantt has testified that she has been forced by the events of December 7 (not just the abduction and rape) to seek psychiatric or psychological counseling for anxiety attacks, when she never before had suffered such attacks or sought such counseling. Gantt also testified that she "still" cannot "go too many places by myself" and she "keeps having anxiety attacks," which occur "three, four and five times a week" and frequent nightmares.

Security USA has failed to offer convincing evidence indicating that Claggett's assignment of Gantt to unsecured Post #9 and Claggett's obdurate refusal to remove Gantt even after Sheppard telephoned her there could not have caused a significant portion of the severe emotional distress that Gantt testified she continued to suffer

after December 7. Given this record, we cannot hold that the district court properly granted summary judgment on this basis. We note that Maryland's highest court has held that an employee's far less egregious conduct toward another employee caused emotional distress sufficient to preclude summary judgment for the employer. *See Federated Dep't Stores, Inc. v. Le*, 595 A.2d 1067 (Md. 1991) (holding trial court should not have granted summary judgment to employer when employee offered evidence a company security officer falsely accused him of stealing a calculator and coerced him into signing a confession, resulting in his loss of his job (not fear for his life like Gantt) and loss of sleep "for weeks" (not still reoccurring nightmares like Gantt)).

With respect to the second portion of Gantt's emotional distress claim — that growing out of the abduction and rape — the district court did correctly acknowledge what we believe is undeniable: the distress suffered as a result of these acts "would likely meet the high burden of 'severe emotional distress.'" The court held, nevertheless, that the acts did not provide the basis of an intentional infliction of emotional distress claim because they were "*caused by Sheppard, not by Claggett*" and no evidence suggested that Claggett "*intended* for Plaintiff to suffer, or even recklessly disregarded the possibility of, the severe emotional trauma of being abducted, threatened and raped." (emphasis in original). The court concluded that "[o]nce again, therefore, the causal link between wrongful intentional conduct and severe emotional distress required by the third prong is absent."

There are several problems with this analysis. First, the district court seems to have concluded that the presence of an intervening actor, Sheppard, necessarily severs any causal connection between Claggett's intentional conduct and the severe emotional distress suffered by Gantt during the abduction. Second, given Claggett's knowledge about Sheppard's past behavior and threats of violence, the court too easily dismissed the argument that Claggett recklessly disregarded a high degree of probability that assigning Gantt to Post #9 would result in her suffering violence at the hands of Sheppard. Finally, the court completely ignored Gantt's evidence that Claggett aided and abetted Sheppard, a tort that would require Claggett to only "have engaged in assistive conduct that [s]he would know would contribute to the happening of that act." *Saadeh v. Saadeh, Inc.*, 819 A.2d. 1158,

1171 (Md. Ct. Spec. App. 2003). Thus Gantt appears to have forecast evidence that Claggett engaged in conduct that knowingly assisted or recklessly disregarded a high probability that Gantt would be subjected to severe emotional distress in connection with the second portion of her emotional distress claim.

This, however, does not end the inquiry.

### B.

Because, as Gantt concedes, her emotional distress arose out of, and in the course of, her employment with Security USA, regardless of whether she forecast evidence sufficient to prove an intentional infliction of emotional distress claim, she must also offer evidence that her employer deliberately intended to injure her. This is so because the Maryland Workers' Compensation Act, Md. Code Ann., Lab. & Empl. § 9-509(a)-(b)(1999)(the Act), provides Gantt's exclusive remedy *unless* she can prove she was injured "as the result of the *deliberate intent* of [her] employer to injure" her. *Id.* § 9-509(d) (emphasis added). Maryland's high court has unequivocally held that this intentional tort exception to the Act's normal exclusivity rule requires proof of the employer's "actual, specific and deliberate intent to injure the employee." *Johnson v. Mountaire, Farms of Delmarva*, 503 A.2d 708, 712 (Md. 1986). Proof of an employer's "willful, wanton, or reckless conduct" even when that conduct is "undertaken with a knowledge and appreciation of a high risk to another" does not suffice. *Id.* An employee cannot bring a tort action based on such evidence; rather, in those circumstances, the Act provides an employee's exclusive remedy. *Id.*

In ruling on Security USA's motion to dismiss all of Gantt's tort claims on the ground that the Maryland Workers' Compensation Act provides her exclusive remedy for those claims, the district court clearly understood the proper relationship between the Act and common law torts.[2] The court dismissed Gantt's negligence, gross negli-

---

[2]Security USA does not. Although the company recognizes that when, as here, an intentional tort causes the claimed injury, § 9-509(d) provides an exception to the normal Workers' Compensation Act exclusivity rule,

gence, and negligent hiring claims because it found the Act barred Gantt from recovering from her employer in a tort action on these bases. But the court specifically refused to dismiss the intentional infliction of emotional distress claim, finding that the intent to injure exception of the Workers' Compensation exclusivity rule applied to it.

When considering Security USA's motion to dismiss Gantt's emotional distress claim, the district court carefully recounted Gantt's allegations as to Security USA's intent and found that, under Maryland law, Gantt had alleged facts sufficient to come within the intent to injure exception. In so concluding, the court relied on the most analogous Maryland case, *Le*, 595 A.2d 1067. There, an employee sued his employer for intentional infliction of emotional distress after a company security guard coerced him into signing an allegedly untrue confession to theft, an act which assertedly caused the employee to cry, lose his job, and be unable to trust people or "sleep for weeks after his discharge." *Id.* at 1067. On these facts, the trial court in *Le* granted the employer summary judgment, finding the Workers' Compensation Act provided the employee's exclusive remedy. *Id.* at 1070. Maryland's highest court reversed, holding that the "deliberate intent to injure" exception to the Workers' Compensation exclusivity rule applied, and so the "employer [could] be held liable" to his employee in tort for intentional infliction of emotional distress. *Id.* at 1074, 1075.

---

it argues that this intentional tort exception somehow requires Gantt to prove as the "first prong" of her intentional infliction of emotional distress claim "a deliberate intent to injure." Brief of Appellee at 23. In fact, all "prongs" of an emotional distress claim — including the first — remain the same no matter who the plaintiff and defendant are. What the Workers' Compensation Act does do is preclude a covered employee from recovering from her employer in tort unless the employee was injured "as the result of the deliberate intent of the employer to injure." § 9-509(d). Thus the Act may preempt Gantt's ability to recover in a tort action for intentional infliction of emotional distress against Security USA, but, contrary to Security USA's suggestion, the Act does not change the quantum of proof necessary to establish the "first prong" of the tort.

On appeal, Security USA does not contend that the district court erred in refusing to *dismiss* Gantt's emotional distress claim on grounds of Workers' Compensation exclusivity. Indeed, at oral argument Security USA acknowledged that this ruling was correct, given Gantt's "allegations." Security USA maintains, however, that on summary judgment the district court should have concluded that the "intent to injure" exception to Workers' Compensation exclusivity did not apply to Gantt's intentional infliction of emotional distress claim.

We cannot agree with this argument with respect to the first portion of Gantt's emotional distress claim — that growing out of Claggett's intentionally assigning Gantt to unsecured Post #9. Certainly in connection with that portion of her claim, Gantt has offered as much evidence of "deliberate intent to injure" as the plaintiff-employee in *Le*.[3] A jury could infer from the evidence proffered by Gantt that Security USA's supervisor, Claggett, despite awareness of Sheppard's abuse of Gantt and Gantt's well-founded fear of Sheppard, believed it all-important that Gantt and Sheppard "talk," and so deliberately deter-

---

[3]Judge Niemeyer contends that because Claggett was the lowest level supervisor, *post* at 19-20 (albeit the *only* supervisor at the time of the December 7 incident), her conduct should not be imputed to Security for purposes of the Workers' Compensation "intent to injure" exception. But Security, like any corporation, can act only through its agents, and Gantt has specifically alleged that Security acted through its agents, "particularly Sgt. Claggett," in its treatment of her. Neither in moving for summary judgment nor on appeal has Security attempted to disavow any of Sgt. Claggett's conduct or argue that it should not be imputed to the company for purposes of the "intent to injure" exception. The company's reluctance to disavow Sgt. Claggett's conduct may well rest on its reading of the directive of the *Le* court that "for an employer to be held liable for the intentional torts of an employee committed within the scope of employment, the employee need not be the alter ego of the employer" and the "employee's acts need not be expressly authorized" by the employer. *Le*, 595 A.2d at 1074 (internal quotation marks and citations omitted). Although *Le* did not delineate the precise boundaries of the employer's vicarious liability in the context of the "intent to injure" exception, certainly its holding and Security's failure to argue that Sgt. Claggett's conduct could not be imputed to the company counsel against upholding the district court's grant of summary judgment on this alternative ground.

mined to inflict on Gantt any emotional distress she might suffer from talking to Sheppard, even talking to him face to face, at Post #9 on December 7, 1996. Thus Gantt has offered evidence from which a jury could conclude, as she asserted in opposing Security USA's motion to dismiss, that "Claggett intentionally inflicted emotional distress upon Dominique Gantt when she ordered her to assume Post 9, while fearing for her life."

With respect to the second portion of Gantt's emotional distress claim — that growing out of the abduction and rape — however, we agree that Gantt has failed to offer evidence at the summary judgment stage sufficient to support her assertion at the motion to dismiss stage that Claggett "intentionally assigned Dominique Gantt to Post 9, with the intention and for the purpose of giving Gary Sheppard access to her so that he could assault her, batter her, [and] kidnap her." Gantt simply did not present evidence from which a reasonable jury could find that Claggett acted with an "actual, specific and deliberate intent" to cause, and with a "desire to bring about" the assault, battery, rape, and emotional distress resulting from them. *See Johnson*, 503 A.2d at 712. Just as in *Johnson*, Maryland's highest court affirmed the dismissal of Rodney Johnson's claim because he failed to allege facts "to show that [his] employer had a 'desire' to bring about the consequences of the acts or that the acts were premeditated with the specific intent to injure Rodney," so we must affirm the grant of summary judgment on this portion of Gantt's emotional distress claim because she has failed to offer evidence demonstrating that her employer "had a 'desire' to bring about" her abduction, rape, and resulting emotional distress, or that its "acts were premeditated with the specific intent" to impose this injury on her. *Id.*

IV.

In summary, we affirm the district court's order dismissing Gantt's sexual harassment claim and that portion of its order granting summary judgment on the emotional distress claim growing out of her abduction and rape. We reverse that portion of the order granting summary judgment on the emotional distress claim growing out of Claggett's intentional assignment of Gantt to unsecured Post #9.

*AFFIRMED IN PART AND REVERSED AND*
*REMANDED IN PART*

NIEMEYER, Circuit Judge, concurring in Part II of Judge Motz' opinion and dissenting from the judgment:

I concur in Part II of Judge Motz' opinion, which affirms dismissal of Dominique Gantt's claims under the Fifth Amendment and Title VII of the Civil Rights Act of 1964. But with respect to Gantt's claim for intentional infliction of emotional distress under state law, I would affirm the judgment of the district court, but on different grounds. Gantt has not shown that Security USA, Inc. ("Security USA"), her employer, "deliberately intended" to cause the injury that Gantt suffered, and therefore Gantt's state law claim against Security USA can only be made as a claim for benefits under the Maryland Workers' Compensation Act. Accordingly, I dissent from the judgment remanding this case to the district court for further proceedings.

I

Security USA, which contracted with the federal government to supply security for the New Carrollton federal building in Lanham, Maryland, employed Dominique Gantt as a security guard and assigned her to the New Carrollton building.

While assigned to the New Carrollton building, Gantt advised her employer that she had obtained a protective order against her boyfriend, Gary Sheppard, prohibiting him from contacting Gantt anywhere, including at her place of employment, and Gantt provided her supervisors with a copy of the protective order. Security USA's Project Manager Earl Wood instructed all Security USA supervisors, including Gantt's supervisor, Sergeant Angela Claggett, to assign Gantt to an inside post to deny Sheppard access should he violate the protective order.

Sometime later, in November 1996, Sergeant Claggett transferred a telephone call from Sheppard to Gantt even though Claggett knew that it violated the protective order. Claggett, who knew Sheppard from another security job at which she worked, explained to Gantt, "[A]ll he wants to do is talk to you." Claggett urged Gantt, "[J]ust talk to him." Gantt took the telephone call, told Sheppard not to call again, and hung up. After hanging up, Gantt reported the call to Project Manager Wood.

Several weeks later, on December 6, 1999, Sergeant Claggett assigned Gantt to guard the underground garage, Post 9, which was an "outside post." Within 15 minutes of taking the post, Gantt received another telephone call from Sheppard. After the call, Gantt notified Claggett of the call and requested to be reassigned to a location inside the building, in accordance with Project Manager Wood's order. Sergeant Claggett insisted that Gantt remain at her post.

Approximately 45 minutes later, Sheppard arrived at the New Carrollton building and went to Post 9, where he physically abducted Gantt with a shotgun, forced her into his van, and drove away. When Sergeant Claggett was advised of the abduction, she refused to call the police, stating, "[N]o, we don't need to call the police because [Sheppard] doesn't want to hurt her, he just wants to talk to her." But five to ten minutes later, she nevertheless did call the police.

In the meantime, Sheppard drove Gantt from the New Carrollton building into the District of Columbia, Maryland, and Delaware. He verbally abused Gantt, threatened her, physically assaulted her, and raped her. In order to extricate herself from Sheppard's control, Gantt promised Sheppard a reconciliation if he would voluntarily turn himself in to the police. When he complied, the police arrested him.

Gantt commenced this action against Security USA alleging a violation of the Fifth Amendment, a violation of Title VII of the Civil Rights Act, and the commission of two state law torts — intentional infliction of emotional distress and negligence. The district court dismissed the federal law counts and the negligence count on the ground that they failed to state claims upon which relief could be granted. With respect to the claim for intentional infliction of emotional distress, the district court granted summary judgment in favor of Security USA. This appeal followed.

II

With respect to Gantt's appeal from the district court's dismissal of her federal claims, I concur in what Judge Motz has written in Part II of her opinion, and therefore, I do not address those claims any further. Gantt did not appeal the dismissal of her negligence claim.

### III

With respect to Gantt's claim that Security USA is liable to Gantt on her claim of intentional infliction of emotional distress, I would affirm the judgment of the district court for the reasons that follow.

The parties seem to agree that Gantt's claims against Security USA for her injuries arose "in the course of" her employment with Security USA. *See Knoche v. Cox*, 385 A.2d 1179, 1182 (Md. 1978) ("'[A]n injury arises "in the course of employment" when it occurs within the period of employment at a place where the employee reasonably may be in the performance of [her] duties and while [she] is fulfilling those duties or engaged in doing something incident thereto'" (quoting *Watson v. Grimm*, 90 A.2d 180, 183 (Md. 1952))). The district court observed likewise:

> It is undisputed that Gantt suffered her injuries at the hands of a third party, Sheppard, while at work, and that she was on duty at the time and expected to be at her post.

Thus, Gantt was an employee covered by the Maryland Workers' Compensation Act. *See* Md. Code Ann., Lab. & Empl. § 9-101(b), (f).

Except for specified intentional conduct, the Maryland Workers' Compensation Act provides the exclusive remedy for injuries sustained by an employee in the course of employment. *See id.* § 9-509(a), (b) ("The liability of an employer under this title is exclusive [and] the compensation provided under this title to a covered employee . . . is in place of any right of action against any person"); *Hastings v. Mechalske*, 650 A.2d 274, 278 (Md. 1994). Under the Act, Security USA would thus have to compensate Gantt for any "accidental personal injury" that Gantt were to sustain in the course of her employment, regardless of fault as to the cause of injury. *See DeBusk v. Johns Hopkins Hosp.*, 677 A.2d 73, 76-77 (Md. 1996). "Accidental personal injury" occurs and the Workers' Compensation Act applies even to injuries to an employee willfully caused by a third person, so long as the injury was sustained in the course of employment. *See Edgewood Nursing Home v. Maxwell*, 384 A.2d 748, 753 (Md. 1978) (applying the Act to a nurse killed by her boyfriend for reasons unrelated to her job). Accordingly, Gantt's claim for inten-

tional infliction of emotional distress against Security USA is barred by the immunity conferred by the Act unless her claim falls within the narrow exception provided by § 9-509(d) of the Act, which authorizes common law claims for injuries caused by the deliberate conduct *of her employer*. That section provides:

> If a covered employee is injured or killed as the result of the deliberate intent of the employer to injure or kill the covered employee, the covered employee or, in the case of death, a surviving spouse, child, or dependant of the covered employee may:
>
> (1) bring a claim for compensation under this title; or
>
> (2) bring an action for damages against the employer.

Md. Code Ann., Lab. & Empl. § 9-509(d). This exception to the immunity from common law liability requires that the injury to the employee be the result of the employer's deliberate intent *to injure*, not simply deliberate conduct. The Act links the injury with the specific intent to bring about that injury. While the plain language of § 9-509(d) imposes that linkage, any doubt is removed by the decision in *Johnson v. Mountaire Farms*, 503 A.2d 708 (Md. 1986). In *Johnson*, the Maryland Court of Appeals held that a suit against an employer for the death of a worker where the employer placed the worker in dangerous conditions did not qualify for the "deliberate intention" exception to the Maryland Workers' Compensation Act and thus was barred. Interpreting the antecedent to § 9-509(d) (Md. Ann. Code art. 101, § 44),* the court embraced the majority view that "'deliberate intention' . . . implies the formation by the employer of *a specific intention to cause injury* or death combined with some action aimed as accomplishing such result." *Johnson*, 503 A.2d at 711 (emphasis added). The court specifically rejected the minority approach of West

---

*In the recodification of the Maryland Code in 1991, Article 101 was placed in the Labor and Employment Article as § 9-101 et seq., and § 44 was revised and included as § 9-509(d) with the intent of making no "substantive change." *See* 1991 Md. Laws ch. 8, § 2 (revisor's note).

Virginia, which interpreted "deliberate intent" to include "'wilful, wanton and reckless misconduct,'" *id.* (quoting *Mandolidis v. Elkins Indus., Inc.*, 246 S.E.2d 907, 914 (W. Va. 1978)). In applying this specific-intent-to-injure requirement, the Court of Appeals in *Johnson* rejected the plaintiff's argument that "deliberate intention . . . requires only that the employer intentionally do the act which happens to cause injury," adopting rather the interpretation that the deliberate intention exception "requires actual, specific and deliberate intent to injure the employee." *Id.* at 711-12; *see also Federated Dep't Stores, Inc. v. Le*, 595 A.2d 1067, 1074 (Md. 1991).

Turning to this case, if Security USA's conduct is analyzed by the actions of its Project Manager Wood, then there is undoubtedly no liability for a common law claim. Wood expressly instructed Sergeant Claggett to assign Gantt to an inside post, undoubtedly to protect, not to injure Gantt. Claggett's disobedience of Wood's direction may be her deliberate conduct, but because that conduct was in contradiction of Wood's order, it cannot be considered as evidence that Security USA, Gantt's employer, deliberately intended to injure Gantt. To the contrary, Security USA's intent is manifested by the order of Project Manager Wood, which must be construed as an order to protect Gantt from harm.

Not all conduct by every employee is imputed to the employer for the purposes of the Maryland Workers' Compensation Act. Maryland courts historically restricted liability to acts authorized by the employer or performed by the employer's alter ego. *See, e.g.*, *Schatz v. York Steak House Sys., Inc.*, 444 A.2d 1045 (Md. App. 1982) (concluding that the conduct of an assistant manager of a restaurant in raping a fellow employee was not the intentional act of the employer so as to constitute the deliberately intended conduct of employer under the Act); *Cont'l Cas. Co. v. Mirabile*, 449 A.2d 1176 (Md. App. 1982) (concluding that the deliberate conduct of a supervisor directed at an employee did not amount to the intentional conduct of employer under the Act). Although the Maryland Court of Appeals in *Federated Dep't Stores* cast doubt on the "alter ego" approach, the court also noted that "it may well be that the General Assembly . . . intended something less than the full sweep of common law respondeat superior liability" in drafting the Workers' Compensation Act. 595 A.2d at 1074. In this case, Claggett was the lowest level

supervisor of the New Carrollton building reporting directly to a general local supervisor and then indirectly to Project Manager Wood. Her conduct as it related to Gantt was not only unauthorized, but expressly disallowed, by her own supervisor. Under *any* analysis of Security USA's common law liability under Maryland's Workers' Compensation Act for its employees' conduct, Claggett's overt disobedience to the order of Project Manager Wood should not be imputed to Security USA.

But even if we were to impute Sergeant Claggett's conduct to Security USA, the evidence does not support a claim that Sergeant Claggett "deliberately intended" the injury suffered by Gantt. To the contrary, the only evidence in the record supports a conclusion that Sergeant Claggett personally knew Sheppard and believed that he had only intended to talk to Gantt and work things out. I agree with the district court's summary of the record where the court concluded:

> [T]aking as true that Claggett assigned Plaintiff to the outside post and failed to call the police after the abduction, there is still no evidence to suggest that Claggett *intended* for Plaintiff to suffer, or even recklessly disregarded the possibility of, the severe emotional trauma of being abducted, assaulted, threatened and raped. To the contrary, the evidence agreed to by Plaintiff in her statement of undisputed facts shows that Claggett told Harvey that Sheppard only wanted to talk to Plaintiff *and would not hurt her*.

At most, one could conclude from the record that Sergeant Claggett was negligent or even reckless. But a common law claim for injury from even wanton or reckless conduct is barred by the Maryland Workers' Compensation Act. *See Johnson*, 503 A.2d at 711 (barring common law claims based on "gross, wanton, wilful or reckless" conduct). Thus, regardless of whether or how Claggett's conduct might satisfy Maryland's requirements for intentional infliction of emotional distress, Claggett's conduct, as demonstrated by the record in this case, does not allow Gantt to escape from the bar imposed by the Maryland Workers' Compensation Act because that Act requires that the employer deliberately intend to bring about the injury of which Gantt complained, and there is no evidence to support that conclusion even if Claggett's conduct were imputable to Security USA.

My colleagues suggest that factual questions remain about Claggett's intent to injure based on circumstances that Claggett knew of facts underlying the protective order against Sheppard and that Claggett must have intended the uncomfortable anxiety that Gantt suffered in manning Post 9 before Sheppard arrived. Were such injury the totality of the matter, it surely would fall short of constituting injury for purposes of either the Maryland Workers' Compensation Act or intentional infliction of emotional distress. Moreover, the record in this case provides no support, absent speculation, that Claggett even intended to injure Gantt by creating anxiety for her. To the contrary, the record shows that Claggett was intending to act, however clumsily, as counselor or peacemaker, assuring Gantt that Sheppard only wanted to talk to her and repair their relationship. Claggett's misguided judgment and perhaps even recklessness, however, cannot support a finding that she deliberately intended to injure Gantt. *See Johnson*, 503 A.2d at 711.

Because the conduct alleged and established on the record for summary judgment does not fit the narrow exception to common law immunity provided by the Maryland Workers' Compensation Act, Gantt's claim against Security USA must be for benefits under that Act, and I would therefore affirm the district court's summary judgment in favor of Security USA on Gantt's common law claim, but for reasons different from those given by the district court.

LUTTIG, Circuit Judge, concurring in part and dissenting in part:

I join Part II of the majority opinion, affirming the district court's dismissal of Gantt's sexual harassment claim. I also concur in Part III, insofar as it reverses the district court's order of summary judgment as to the emotional injuries suffered by Gantt as she waited outside at Post 9.

I dissent, however, from the majority's affirmance of the district court's order dismissing Gantt's claim against Security USA for the emotional distress she suffered as a result of her abduction, torture and rape, as barred by the Maryland worker's compensation laws. In my judgment, Gantt has presented sufficient evidence to support a jury verdict that Security USA, acting through supervisor Claggett, "deliberately intended" for Gantt to be abducted, tortured and raped

by Sheppard and to suffer the severe emotional injuries that resulted therefrom. Therefore, I would hold that this portion of Gantt's claim for intentional infliction of emotional distress may be brought by Gantt outside of the provisions of the Maryland workers' compensation laws.

I.

The majority holds, and I agree, that Gantt presented sufficient evidence to withstand summary judgment on each of the elements of her tort claim for intentional infliction of emotional distress against Security, USA for her injuries from the abduction, torture and rape. *See ante* at 10-11. It nevertheless affirms the district court's order dismissing Gantt's claim as to these injuries because it holds that Gantt did not present sufficient evidence to bring herself within the terms of the exception to the Workers' Compensation Act's general prohibition on employee suits for workplace injuries outside the workers' compensation scheme. *See* Md. Code Ann., Lab. & Empl. § 9-509(a), (b). The exception, set forth in Md. Code § 9-509(d), provides that Gantt "may bring an action for damages against her employer" if she demonstrates that she was injured "as the result of the deliberate intent of [her] employer to injure" her. *See* Md. Code Ann., Lab. & Empl. § 9-509(d); *Johnson* v. *Mountaire Farms of Delmarva, Inc.*, 503 A.2d 708, 712 (Md. 1986).

In holding that Gantt has not presented evidence from which a reasonable jury could conclude that Security USA "deliberately intended" to injure Gantt, I believe the majority has failed to draw reasonable inferences from the evidence, taken in the light most favorable to Gantt, and, in so doing, decided itself a factual question that should have been left to a jury instead.

Claggett, Gantt's supervisor, and Sheppard, her former boyfriend and attacker, were friends from work and they often discussed Sheppard's relationship with Gantt. Claggett knew that Sheppard had previously abused and threatened to kill Gantt. She knew that Sheppard was barred by court order from having any contact with Gantt. And she knew that, by order of manager Earl Wood, Gantt was not to be stationed at an outside post, in order that she be protected from Sheppard. Yet, on the very morning in question, Claggett ordered Gantt to

report to post 9, an outside post, ignoring both the instructions given to her only a few minutes earlier by Willie Jones, the supervisor that preceded her, and Gantt's own pleas that she would not be safe if located at post 9. Then, within fifteen minutes of Gantt assuming post 9, Claggett knowingly violated the protective order against Sheppard and transferred a telephone call from him to Gantt. Alarmed by Sheppard's call, Gantt again pleaded with Claggett that she be transferred from post 9 to an inside post where she would not be vulnerable. Claggett rebuffed Gantt, insisting that she remain at post 9. Less than an hour later, Sheppard arrived at post 9 and kidnapped Gantt at gunpoint. *When told that Gantt had been abducted at gunpoint and was being driven away in a van, Claggett even still refused to intervene to protect Gantt by calling the police, instructing other employees not to be alarmed.*

A reasonable jury could take Claggett at her word, as both the majority and Judge Niemeyer appear to do, and conclude from these facts that she intended nothing more than for Sheppard to talk to Gantt at her post on the morning in question, and, therefore, that her obstinate disregard of both Sheppard's threats and the repeated admonitions of her immediate supervisor, the supervisor that she replaced, and Gantt herself amounted only to "misguided judgment" or "recklessness" in light of the danger Sheppard posed to Gantt.

But a reasonable jury need not reach such an innocent conclusion as to Claggett's motivations. It could just as readily find that Claggett acted intentionally and in concert with Sheppard on the morning in question, not, as Judge Niemeyer contends, as a "counselor or peacemaker" to Gantt and Sheppard. *Ante* at 21 (opinion of Niemeyer, J.). Such a jury could draw the inference that it was not mere coincidence that Sheppard arrived at post 9 at 7 a.m. on the same morning that, just an hour earlier, Claggett had stationed Gantt at that same post, but, instead, that Sheppard arrived there because Claggett had arranged with Sheppard for him to have access to Gantt at that time and place. It could also infer that Claggett refused Gantt's pleas to be moved to an inside post for the very reason that Claggett did intend to facilitate Sheppard's access to Gantt. Such a jury could further determine that when Claggett, having just been told by frantic security guards that Sheppard abducted Gantt at gunpoint, assured her fellow guards, "no, we don't need to call the police because [Sheppard]

doesn't want to hurt her, he just wants to talk to her," she spoke, not because she actually believed that such was Sheppard's purpose, but, rather, to prevent those guards from interfering with Sheppard's abduction of Gantt. And that Claggett ultimately called the police herself five to ten minutes later, not because she suddenly became convinced that Sheppard may have something else in mind, but rather because she surmised (correctly) that, by this time, Sheppard would have had the opportunity to leave the premises with Gantt.

These inferences are not, of course, compelled, but each would be well-supported by the evidence in this case. And, were a jury to so conclude, it could determine that Claggett's actions, taken as a whole, demonstrated a *deliberate intent* "to bring about the consequences of [her] act[s]," *see Johnson*, 503 A.2d at 712, Gantt's abduction, torture and rape, as well as the emotional injuries that attended each.

On this basis, I would reverse the district court's judgment outright and remand for trial.

## II.

Judge Niemeyer suggests an additional reason that Gantt may not proceed with her claim outside of the provisions of the Workers' Compensation Act, namely, that Claggett's actions cannot be imputed to Security, USA because "Claggett was the lowest level supervisor of the New Carrolton building" and her actions were "not only unauthorized, but expressly disallowed" by a superior's order. *See ante* at 20 (opinion of Niemeyer, J.). The majority opinion dismisses this suggestion in a footnote for the entirely valid reason that Security USA itself has not attempted, either before the district court or on appeal, to disavow that Claggett was acting as its agent in stationing Gantt at an outside post. *See ante* at 13 n.3. But in any event, in so contending, Judge Niemeyer distorts the law of Maryland, as set forth by the Maryland Court of Appeals in *Federated Dep't Stores Inc. v. Le*, 595 A.2d 1067 (Md. 1991).

The Maryland courts have not, contrary to Judge Niemeyer's assertion, "historically restricted liability to acts authorized by the employer or performed by the employer's alter ego." *Ante* at 29 (Opinion of Niemeyer, J.). In fact, when the Maryland Court of

Appeals considered the question over a decade ago, it did not merely "cast doubt" on the alter ego approach. It expressly *declined* to read the Maryland Workers' Compensation Act to require a showing that the employee was the "alter ego" of the employer, rejecting the approach taken in *Schatz* v. *York Steak House Sys., Inc.*, 444 A.2d 1045 (Md. App. 1982) and *Cont'l Cas. Co.* v. *Mirabile*, 449 A.2d 1176 (Md. App. 1982). *See Le*, 595 A.2d at 1074 (holding that the 'intent to injure' exception to the general exclusivity of the workers' compensation act does not "embody[ ] the particular restriction upheld . . . in *Mirabile* and *Schatz*"). Moreover, the *Le* court made clear that the act in question need not be taken by an employee with the "express authorizat[ion]" of the employer itself before it could be imputed to that employer. *Id.*

Finally, while *Le* did state that, "it may well be that the General Assembly, by the language 'deliberate intention of *his employer* to produce such injury,' intended something less than the full sweep of common law respondeat superior liability," *id.*, there is nothing in the Maryland case law to suggest that the legislature intended to protect an employer from suit where, as here, its supervisor acted, as a supervisor, in the normal course of her employment, with the deliberate intent to injure another employee — simply because that supervisor's action violated the order of an absent, higher-ranking company official. *Cf. Hastings* v. *Mechalske*, 650 A.2d 274, 281 (Md. 1994) (holding that, "the employer remains liable with respect to the duty, regardless of the acts or omissions of the person entrusted to perform it"). Nor would such a rule be wise. Whether or not there were other people above Claggett in the Security, USA hierarchy, there is no question that, on the morning of Gantt's abduction, Claggett was the supervisor in charge of the New Carrolton building for Security, USA. As an employee of Security, USA, Gantt had no choice but to abide Claggett's orders; there were, after all, no higher-ranking authorities present to whom Gantt could appeal. That Claggett's order represented the order of her employer is the only reason that Gantt remained outside at post 9, in fear for her life.

Moreover, were we to hold that a supervisor's actions could not be imputed to an employer whenever the employer had a standing policy against the action taken by a supervisor, it would render the 'intent to injure' exception to exclusivity set forth in section 509(d) a near

nullity, relevant only to those rare occasions when an employer did *not* have a policy of some sort forbidding actions taken with a "deliberate intent" to kill or injure another employee. Without any guidance in the statutory text or the caselaw, I would never so restrictively interpret this provision.